NO. 07-01-0282-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL E

MAY 8, 2003

_____

NATURAL GAS CLEARINGHOUSE,

Appellant

v.

MIDGARD ENERGY COMPANY, FORMERLY KNOWN AS
MAXUS EXPLORATION COMPANY,

Appellee
_____

FROM THE 181ST DISTRICT COURT OF POTTER COUNTY;

NO. 79,496-B; HON. JOHN B. BOARD, PRESIDING
_____

***Opinion***
_____

Before JOHNSON, C.J., QUINN, J., and BOYD, S.J.[1]

Natural Gas Clearinghouse (NGC) appeals from a final judgment awarding

damages to Midgard Energy Company, formerly Maxus Exploration Company (Maxus), for

breach of contract. It argues, through 11 issues, that 1) it did not breach the contract, 2)

the testimony of Maxus' expert witness was inadmissible and constituted no evidence of

---

[1] John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. TEX. GOV'T CODE ANN. §75.002(a)(1) (Vernon Supp. 2003).

damages, 3) a portion of the award includes "speculative damages" which could not be awarded, 4) the amount of prejudgment interest awarded was inaccurate, and 5) the amount of attorney's fees awarded was inaccurate. We affirm the judgment in part and reverse and remand in part.

### Background

Before us is the latest chapter in the continuing saga of Maxus versus NGC. Having initially reversed, in part, a summary judgment granted to Maxus, *see Natural Gas Clearinghouse v. Midgard Energy Co.*, 23 S.W.3d 372 (Tex. App.--Amarillo 1999, pet. denied), we remanded the cause for further proceedings. Upon remand, a trial was had to the court. As a result of same, the trial court found that NGC had breached its agreement with Maxus to deliver a specified quantity of gas over a term of five years. This breach caused Maxus to suffer damages in the amount of $2,781,415.73. Furthermore, the trial court awarded Maxus pre and post judgment interest and attorney's fees. NGC appealed once again.

The agreement in question underwent amendment after its inception. The relevant provisions in existence at the time of the breach follow:

> Whereas, Maxus operates the Roger Mills Gas Processing Plant . . . which is capable of extracting liquefiable hydrocarbons from the gas contained in NGC's Pipeline Gas . . .,
>
> Whereas, NGC has control of certain volumes of gas that are available for processing . . .,
>
> 1.6 "Pipeline Gas" or "Gas" shall mean NGC's natural gas without the removal of any of its constituents, as it is produced from the well, and delivered at the discharge side of a conventional mechanical type separator, treater or tank,

2

and shall include gas produced from a well producing natural gas only, or from a well producing distillate, condensate, or oil with the gas . . .,

* * *

2.1     Facilities - NGC owns and has installed the necessary facilities for the delivery of gas to the Processing Plant . . .,

* * *

3.1     Delivery of Gas by NGC - NGC agrees to deliver and [Maxus] agrees to receive, or cause to be received at the NGC Delivery Point the lesser of a quantity of gas equal to 1) all volumes produced into NGC Muletrain Lateral and NGC Moorewood East Lateral which collectively exceed 20,000,000 cubic feet of gas per day based on an annual average, or 2) a volume representing available spare processing capacity at the Plant . . . . Except for connecting [Maxus'] own production or purchasing gas at the wellhead from third party producers and any arrangements in existence as of May 1, 1991, [Maxus] agrees not to enter into any arrangements with third party gatherers other than NGC which would negatively affect the processing capacity for NGC's gas [,][2]

* * *

3.4     Payment for Plant Product - [Maxus] shall pay NGC each month as NGC's share of the Plant Products an amount equal to the proceeds from the sale of eighty-five percent (85%) of the Plant Products attributable to NGC's Gas which is processed at the Plant [,]

* * *

10.1    Term - This agreement shall remain in full force and effect for five (5) years from the first day of the month immediately following the month in which [Maxus] has given NGC written notice that the first flow has begun into the second processing unit and thereafter shall continue on a month-to-month

---

[2]Section 3.1 of the contract was one of the provisions amended after execution of the original agreement.  Before amendment, the parties stated therein that NGC was to deliver a "quantity of gas equal to the greater of . . . the volume necessary to have 10,000 MMBTU/day be redelivered by Operator from NGC's share of Residue Gas and bypass gas . . . or such volume representing existing available spare processing capacity at the plant."  They also expressly acknowledged that Maxus "will be supplying gas for processing at the Plant from its own production and supplied by others (Operator's Gas) and the volume of Operator's Gas may be in an amount that causes the Residue Gas redelivered to NGC to be less than 10,000 MMBTUs/day."

> basis unless terminated by either party by giving the other party thirty . . . days prior written notice . . . [and,]
>
> \* \* \*
>
> 14.9 <u>Successors and Assigns</u> - This agreement shall be binding upon and will inure to the benefit of the parties hereto, their respective successor and assigns, and upon any assignment or transfer of this agreement or of any interest by either party in the facilities herein described, the assignee shall agree and be deemed hereby to have agreed to perform the obligations hereunder of the assigning party relative to the facilities or property so assigned . . . .

Furthermore, the trial court found that in April of 1993, NGC began reducing deliveries of gas to Maxus. Approximately ten months later, it stopped all deliveries. This was so because the gathering system was acquired by Apache Corporation, which entity subsequently transferred it to Transok Gas Gathering Company.

The trial court made other findings, which no one disputes. First among these is the determination that NGC represented that it owned the Muletrain Lateral and Moorewood East Lateral systems through which gas was to be transferred to Maxus. Moreover, this finding comports with NGC's representation in paragraph 2.1 of the contract wherein it stated that it "owns . . . the necessary facilities for the delivery of gas to the Processing Plant ." The necessary facilities included the NGC Muletrain and Moorewood East Laterals. Additionally, this finding is of import because, according to the testimony, the entity gathering the gas ordinarily had the contractual right to process and remove the liquids from it. Other pertinent, and undisputed, findings are that 1) NGC represented that it had "'control of certain volumes of gas available for processing,'" and 2) "Transok

4

offered to take over NGC's position under the Maxus contract and pay NGC consideration for it, but NGC refused."

### *Issues One, Two and Three — No Breach or Evidence of Breach*

Through its first three issues, NGC contends that, upon a "proper construction" of the contract, it did not breach same nor is there evidence of a breach. The "proper construction" alluded to is one which simply obligated it to provide Maxus the gas that it owned or controlled and transported through the two Laterals so long as it owned or controlled the gas. Since it no longer owned or controlled either Lateral or the gas transported through them once Apache and then Transok acquired the Laterals, its obligation to provide gas to Maxus ended. And, because it was not obligated to provide that gas to Maxus, it did not breach the contract, NGC concludes. We disagree and overrule the points.

*Authority*

As can be seen, resolution of this dispute entails interpretation of the contract and its amendments. Thus, various rules regulating the construction of contracts are worth noting. First, we must remember that construing an unambiguous contract involves a question of law. *Cross Timbers Oil Co. v. Exxon Corp.*, 22 S.W.3d at 26; *Borders v. KRLB, Inc.*, 727 S.W.2d 357, 359 (Tex. App.--Amarillo 1987, writ ref'd n.r.e.). Because it does, we need not defer to any interpretation afforded it by the trial court. *Cross Timbers Oil Co. v. Exxon Corp.*, 22 S.W.3d at 26. Second, when interpreting an instrument, we strive to give effect to its parties' intent. *Id.* Furthermore, that intent is garnered from the language of the contract, which language is considered in its entirety. *Id.* That is, we peruse the

5

complete document to understand, harmonize, and effectuate all of its provisions. *Id.* So too must we afford the words contained in the agreement their plain, ordinary, and generally accepted meaning, unless the instrument requires otherwise. *Id.*; *Sun Operating, Ltd. v. Holt*, 984 S.W.2d 277, 285 (Tex. App.--Amarillo 1998, pet. denied).

Finally, in applying the foregoing rules we may not rewrite the agreement to mean something it did not. *Cross Timbers Oil Co. v. Exxon Corp.*, 22 S.W.3d at 26; *Borders v. KRLB, Inc.*, 727 S.W.2d at 359. Simply put, we cannot change the contract merely because we or one of the parties comes to dislike its provisions or thinks that something else is needed. *HECI Explor. Co. v. Neel*, 982 S.W.2d 881, 888-89 (Tex. 1998); *Cross Timbers Oil Co. v. Exxon Corp.*, 22 S.W.3d at 26. This is so because parties to the agreement are considered masters of their own choices. They are entitled to select what terms and provisions to include in a contract before executing it. And, in so choosing, each is entitled to rely upon the words selected to demarcate their respective obligations and rights. In short, the parties strike the deal *they* choose to strike and, thus, voluntarily bind themselves in the manner *they* choose. *Cross Timbers Oil Co. v. Exxon Corp.*, 22 S.W.3d at 26. And, that is why parties are bound by their agreement as written. *Cross Timbers Oil Co. v. Exxon Corp.*, 22 S.W.3d at 26; *Emmer v. Phillips Petroleum Co.*, 668 S.W.2d 487, 490 (Tex. App.--Amarillo 1984, no writ). For a court to change the parties' agreement merely because it did not like the contract, or because one of the parties subsequently found it distasteful, would be to undermine not only the sanctity afforded the instrument but also the expectations of those who created and relied upon it. *Cross*

6

*Timbers Oil Co. v. Exxon Corp.*, 22 S.W.3d at 26-7. With this said, we turn to the agreement before us.

*Application of Authority*

Through the preamble and paragraph 2.1 of the contract, NGC represented to Maxus that it 1) owned the gas gathering system, which included the Muletrain and Moorewood East Laterals, and 2) had control of a certain quantity of the gas transported through it which was available for processing. Then, according to paragraphs 3.1 and 10.1 of the amendments, it promised to provide Maxus, for five years, with a specific amount of that gas via the pipe that it purportedly owned. *Natural Gas Clearinghouse v. Midgard Energy Co.*, 23 S.W.3d at 377 (wherein we previously held that the agreement obligated NGC to deliver "all gas controlled by [it] in excess of 20,000,000 cubic feet of gas per day gathered through the East Moorewood and Muletrain Laterals"). Absent from these provisions or any other is language indicating that NGC's ownership of the gathering system or right to control the gas alluded to in the preamble was finite or subject to termination. The opposite is quite true, for if paragraph 14.9 (relating to assignment) is considered, (which it must given the rules of construction), it is clear that both parties intended that the processing of gas from the Laterals through Maxus' Roger Mills Plant continue for at least five years. Also clear is the necessary implication that NGC had a right to gather and pipe gas through those Laterals for at least the term of the contract and in amounts sufficient to supply the quantities specified in paragraph 3.1. This is so because 1) NGC agreed to provide the gas in the specified quantities for five years, 2) nothing in the contract illustrated that its gathering rights were finite or subject to

7

termination, 3) nothing in the contract expressly conditioned NGC's performance upon its continued ownership of the gathering system, and 4) NGC, in good faith, could not have modified its obligation under 3.1 to supply the specified quantities if it knew that it could not or intended not to supply them at the time of the modification.[3]

In plain words, NGC effectively said to Maxus via the contract that: "There's this gas I control through pipeline I own, and I promise to deliver a specified amount of it to you for five years." The contractual language giving rise to this promise was and is neither ambiguous nor unclear, and this is the only plausible interpretation of the agreement. Despite that, NGC would now have the court read into its promise some type of contingency, that is, language conditioning its duty to perform on its continued control of the gas. And, as basis for our doing so, it directs us to the Supreme Court's opinion in *Northern Nat. Gas Co. v. Conoco, Inc.*, 986 S.W.2d 603 (Tex. 1998).[4]

In *Northern*, Conoco agreed to receive and Northern agreed to deliver "'all gas for gathering, compressing and processing in keeping with all the quantity and other provisions of [Northern's] various gas purchase contracts *in effect from time to time*."

---

[3]It is clear that the buying and selling of oil and gas constitutes a transaction in goods. *El Paso Nat. Gas Co. v. Minco Oil & Gas Co.*, 8 S.W.3d 309, 313 (Tex. 1999). If the buying and selling of gas constitutes a transaction in goods, then it logically follows that the buying and selling of the components of gas also constitutes a transaction in goods. And, since it does, then in modifying its original promise regarding the amount of gas it would provide, NGC was obligated to act in good faith. *See id.* (acknowledging that one transacting in goods has a statutory obligation to act in good faith in the performance, enforcement and *modification* of their agreements).

[4]In issuing its opinion, the Supreme Court provided little exposition or analysis of the contract there involved and its terms. This was most likely so since the court expressly agreed with the analysis of the matter contained in the opinion of the intermediate appellate court. *Northern Nat. Gas Co. v. Conoco, Inc.*, 986 S.W.2d 603, 606 (Tex. 1999). Given this, we focus upon the opinion of the intermediate appellate court to determine why Northern was absolved of liability.

8

*Northern Nat. Gas Co. v. Conoco, Inc.*, 939 S.W.2d 676, 678 (Tex. App.--El Paso, 1996), *affirmed in part, reversed in part*, 986 S.W.2d 603 (Tex. 1998) (Emphasis added). Also, contained in the agreement was a provision stating that the accord was to be effective "'for so long as the various Gas Purchase contracts dedicated herein remain in effect, but not less than twenty . . . years . . . .'" *Id.* For various reasons which are unimportant to our dispute, Northern bought out its interests in the gas purchase contracts and stopped sending gas to Conoco for processing. Conoco sued alleging that Northern was obligated to provide it gas. While the trial court agreed with Conoco, neither the intermediate court of appeals nor the Supreme Court did. This was so because Northern's obligation was expressly tied to the "gas purchase contracts *in effect from time to time*" with its producers. According to the court, "[t]his language by its clear and plain terms, anticipated changes in Northern's gas purchase contracts." *Id.* at 679. In other words, the duty to provide gas was expressly contingent upon the gas purchase contracts which may have existed from time to time. If none did, then it had no duty to deliver to Conoco non-existent gas bought under non-existent contracts. Moreover, nothing in the agreement obligated Northern to buy the gas from the producers or otherwise enter into gas purchase contracts. *Id.* Thus, when the underlying gas purchase contracts were terminated, Northern's obligation to deliver gas to Conoco ended, according to the court. *Id.*

In short, the court in Northern found that Northern's duty to deliver was dependent upon the existence of "gas purchase contracts in effect from time to time" between Northern and those producing gas. This differs from the situation and contract before us. Nowhere does the NGC/Maxus agreement contain a provision referencing other contracts

9

between NGC, its producers, or anyone else. Nor does it contain a provision expressly qualifying NGC's obligation to perform upon the existence of or its obligations under any other contract. Indeed, nothing was said about anyone having a right to acquire the gas gathering system from NGC and its subsidiaries and thereby end NGC's control over the gas from the Laterals. Nor does anything in the agreement expressly tie NGC's duty to perform to the existence of third-party contracts granting it the right to acquire gas from the Laterals. Similarly absent is any provision relieving NGC from supplying gas to Maxus if NGC conveyed the pipeline to others and, thereby, lost control over the gas. Indeed, if the Laterals were conveyed to another, the parties expressly contemplated, via paragraph 14.9 of the contract, that the entity acquiring the "facility" would assume the obligation to provide the gas to Maxus. Instead, NGC told Maxus, through the contract, that it owned the pipeline, had control of gas, and promised to deliver that gas for five years. That is a far cry from saying "if I get gas under contracts which may be in existence from time to time, I will deliver it to you for processing for five years." The latter situation existed in *Northern* but not here, and that is why *Northern* is inapposite.

The situation before us is no different from that in which Farmer X agrees to deliver to Buyer Y 1000 bushels of wheat. Farmer X cannot then deliver the bushels to Z and profess immunity from suit by Y because he no longer had the wheat when it came time to deliver it to Y. Here, NGC said it owned the pipeline and controlled the gas out of which it promised to deliver the specified quantity for five years. It did not promise to deliver *whatever gas it had* when it came time to deliver or that *it would deliver gas as long as it owned* the pipeline or controlled the gas. Given that Apache had the option to buy the

10

gathering system, NGC could have easily provided for that contingency. But, it did not. Consequently, we may not rewrite the agreement to provide for circumstances omitted from the agreement simply because NGC now finds that it cannot perform.[5] *Cross Timbers Oil Co. v. Exxon, Inc.*, *supra*. As stated long ago, a "party's failure to exempt himself from responsibility in the event of the happening of [a] contingency will be attributable to his own folly, and he [nonetheless] will be held to make good his contract." *Davis v. Davis*, 266 S.W. 797, 798 (Tex. Civ. App.--El Paso 1924, no writ). That remains true today.[6]

Of record is evidence that NGC bound itself to supply Maxus with gas from the Muletrain and East Moorewood Laterals for five years and that it did not do that contrary to its promise. Consequently, there exists some evidence that it breached its contract with Maxus, and we again hold that Maxus established NGC's contract liability.[7] *Natural Gas Clearinghouse v. Midgard Energy Co.*, 23 S.W.3d at 376.[8]

---

[5]We note that NGC did not raise in its brief the affirmative defense of impossibility.

[6]We agree with NGC's proposition that paragraph 1.6 refers to the natural gas it owned or had a right to control. Indeed, to deliver gas which it did not own or over which it had no right of control would be to deliver gas it converted from others. Yet, in so construing the provision, we do not read it as somehow resurrecting a contingency relieving it from performing if another company acquires the gathering system or the Laterals. Indeed, throughout the contract is reference to different classes of gas which Maxus (the operator) had a right to process. Those classes included "Operator's gas," gas of third-parties other than NGC, and NGC's gas. So, it is logical that in specifying what gas NGC was to deliver and receive compensation for delivering the parties would take care to demarcate NGC's gas as the pertinent gas.

[7]To the extent NGC contends that the record contained no evidence of damage due to its breach of contract, we note that the contention is based upon the trial court's supposed interpretation of the contract. According to NGC, the trial court allegedly held that the contract entitled it to provide gas from any source, not simply that from the Muletrain and Moorewood East Laterals. Yet, the trial court did not so interpret the contract. Nor do we. Rather, the contract obligated NGC to provide gas from those two Laterals in the amount and for the period specified in the contract. Thus, whether Maxus proved the amount of profit it would have garnered had NGC been entitled to provide it gas from *any source* is irrelevant to the disposition of this appeal.

[8]On rehearing, we reversed and remanded as to all issues pursuant to Tex. R. App. P. 44.1(b) because we could not order a separate trial on damages alone.

11

***Issues Four, Five, and Six - Admissibility of Vandivere's Testimony***

In its fourth, fifth, and sixth issues, NGC questions the sufficiency of the evidence to support the damages awarded. It does so by first attacking the trial court's decision to admit the expert testimony of William Vandivere. Vandivere testified about the added operating expense attributable to processing the gas NGC failed to provide. Because it should have been excluded, according to NGC, no evidence supported the award of damages. Furthermore, the trial court purportedly erred in admitting it because 1) Vandivere was not qualified to render an expert opinion on the topic and 2) it was based on unreliable data purportedly illustrating those expenses. Assuming *arguendo* that the testimony was inadmissible, we find the error in admitting it harmless and overrule the issues.

It is clear that when a dispute is tried to the court, as opposed to a jury, we presume that the trial judge disregarded inadmissible testimony, unless the record discloses otherwise. *Gillespie v. Gillespie*, 644 S.W.2d 449, 450 (Tex. 1982); *Williford Energy Co. v. Submergible Cable Serv., Inc.*, 895 S.W.2d 379, 388 (Tex. App.--Amarillo 1994, no writ). Moreover, the admission of such evidence does not warrant reversal if there otherwise appears of record competent evidence supporting the trial court's decision. *Id.*

Here, Maxus conceded that the trial court did not rely on that portion of Vandivere's testimony regarding operating expenses. NGC not only accepted but also agreed with this

concession in its reply brief.[9]  Consequently, nothing prevents us from presuming that the allegedly inadmissible evidence had no effect on the trial court's decision regarding damages.

More importantly, other evidence appears of record supporting the trial court's finding *viz* the operating expenses which would have been incurred by Maxus had NGC performed its agreement.  That evidence was presented by NGC via its own expert witnesses.  One testified that those expenses approximated $22,500 per month.  Then, he acknowledged that another of NGC's testifying experts used "some other ways to look at it from some of the other data . . . ."  When asked if the conclusions derived by use of those "other ways" were "in line with what [he] did," the witness responded, "[i]n my opinion, yes, I - - I think we're all in that [$]20,000 a month range roughly."  Given that the trial court found the monthly operating expense to be $20,000, we can safely conclude that the decision was supported, at the very least, by the testimony of NGC's experts.

NGC would have us ignore the evidence provided by its own experts since it was purportedly offered solely to rebut the evidence offered by Vandivere.  And, as basis for urging us to do so, the company cites the well-settled rule that one does not waive his objection to the improper admission of evidence by attempting to rebut, minimize, or explain that evidence via other evidence.  *Transcontinental Gas Pipeline Corp. v. Texaco, Inc.*, 35 S.W.3d 658, 670 (Tex. App.--Houston [1st Dist.] 2001, pet. denied).  Yet,

---

[9]In its reply brief, NGC stated:  "As Maxus admits, the trial court 'did not accept or rely upon Mr. Vandivere's testimony' on that essential element of damages [*i.e.* operating expenses saved] — the very element that NGC objected to and now raises on appeal."

*Transcontinental* concerns the waiver of an objection to the admission of improper evidence. It does not purport to hold that the evidence tendered by the objecting party cannot be used to assess whether the verdict enjoys the requisite evidentiary support. Nor do we think that the *Transcontinental* court could have so held. Indeed, in determining whether any evidence supports the verdict, the reviewing body must consider "all the evidence" in a light favorable to the verdict. *Id.* at 671. If *all* the evidence appearing of record must be considered, then, logically, we must analyze the evidence presented by *all* the litigants, not just that presented by one party or the other. So, in reviewing the evidence proffered by all the litigants, we must necessarily consider that of NGC on the matter as well.

Moreover, while NGC may believe our consideration of its evidence to be unfair under the circumstances, we liken the situation to that involving a motion for directed verdict. If a defendant were to move for a directed verdict after the plaintiff rests and if the trial court were to deny it, then the movant has a choice to make. He may stand on his motion, rest, and complain about the decision on appeal. Or, he may proceed with his defense and tender his own evidence. If he chooses the latter, then he waives his prior complaint about the sufficiency of the evidence. *Cliffs Drilling Co. v. Burrows*, 930 S.W.2d 709, 712 (Tex. App.--Houston [1st Dist.] 1996, no writ); *Hamill v. Brashear*, 513 S.W.2d 602, 609 (Tex. Civ. App.--Amarillo 1974, writ ref'd n.r.e.). More importantly, should the motion be renewed at the end of trial, the trial court is not restricted to perusing only the evidence admitted before the plaintiff rested in deciding whether to grant it. The contrary is true. The trial judge not only may but must look at all the evidence, including that

14

offered by the defendant, in assessing whether a material issue of fact exists which warrants submission of the case to the jury. *Id.* Thus, by proceeding, the defendant may effectively fill the void about which he complained, and no impropriety arises from considering the defendant's own evidence when deciding if the void was filled. We view that to be the situation here.

NGC had a choice to make. It made it by not only attacking the foundation underlying Vandivere's opinions but also by tendering evidence that it believed accurately reflected the operating expenses which Maxus would have incurred. Having made the choice, having pursued a course that did more than simply attack the qualifications of Vandivere and the accuracy of his data and methodology, and having proffered evidence relevant to the issue of expenses, we, like the courts in *Hamill* and *Cliffs Drilling*, find no impropriety in considering *all* the evidence in resolving the issue before us. Simply put, we must consider it given the standard of review applicable to resolving insufficiency claims.

### *Issue Seven - Damage Evidence for March 1994*

Via its seventh issue, NGC asserts that the trial court erred in awarding Maxus damages for gas which went undelivered during the month of March 1994. The amount of damages involved is $57,143.57. Furthermore, the trial court allegedly erred because Vandivere opined that inclusion of the sum was speculative. We overrule the issue.

NGC's contention implicates its bypass right under the amended contract. Therein, the parties agreed that it could "bypass the gas at the Plant if processing of such gas [was]

uneconomical in NGC's sole opinion." Given this provision, the company was obligated to provide gas each month unless it 1) decided "in its sole opinion" that processing the gas was "uneconomical" for that month and then 2) opted to bypass for that reason. Furthermore, in calculating Maxus' damages, Vandivere apparently omitted several months of gas because he concluded that NGC would have bypassed gas at those times. However, he included damages for the month of March 1994 despite the supposed chance that gas may have been bypassed for that month as well. Whether or not NGC would have opted to do so was "about a tie," according to Vandivere. So, he was "speculating on that one." And, because he was "speculating," it was error to include the amount in his calculations, according to NGC.

While interesting, NGC's contention is flawed. If we are to enforce the contract as written, then we must conclude that NGC was required to provide gas each month until it opted to bypass. So, any calculation of damages must necessarily begin with the premise that gas would have been provided each month. Next, while NGC had the right to bypass gas, the right was conditional. Moreover, the circumstances under which that condition was to arise were far from definite. That is, they were not ascertainable through the application of any expressed formula. Rather, NGC "in its sole opinion" was entitled to decide when processing the gas would be "uneconomical".[10] Thus, *only* NGC could decide if and when bypass would occur. Vandivere was not NGC. Nor was he an officer or

---

[10]Indeed, neither the contract nor the parties attempted to explain what was meant by the term "uneconomical." The latter could evince a situation wherein the income received did not exceed the expenses incurred or where the income, though it exceeded the expenses, was not sufficient, from NGC's point of view, to warrant pursuit of the endeavor. Simply put, the term is quite indefinite and, therefore, invested NGC with much discretion.

employee of that company. So, he could not exercise the discretion vested solely in NGC. Furthermore, the latter cited us to no evidence of record indicating that Vandivere was privy to the indicia or formula, if any, which NGC may have used, at any particular time, to determine whether, at any particular time, processing gas was "uneconomical." Given this, to venture a guess about whether or not NGC would exercise a right at any particular time and under conditions which only it could assess in its discretion would be utter speculation on the part of Vandivere.[11] So, the error, if any, arose not from Vandivere including March 1994 in his calculations but by omitting therefrom the months about which he speculated that NGC would have bypassed its gas.

### Issues Eight and Nine - Prejudgment Interest Rate

Via its eighth and ninth issues, NGC argues that the trial court erred in refusing to calculate prejudgment interest at the rate of six percent per annum under §302.002 of the Texas Finance Code and toll the accrual of such interest for two years. We overrule the issues.

*Six Percent*

As to the contention that the trial court should have calculated prejudgment interest at six percent as opposed to ten, we note that it is founded upon statutory language that did not exist at the time of trial and entry of the final judgment. Though §302.002 once

---

[11]Interestingly, Vandivere admitted as much. In attempting to explain why he included March in his calculations, he stated "because you see when I calculate . . . I don't know what their [NGC's] gas price was . . . I don't know what their [NGC's] situation was . . . ."

17

directed that prejudgment interest was to accrue at six percent per year on "all contracts ascertaining the amount payable" when no specified rate was agreed upon by the parties, the statute was amended in 1999. Additionally, the amendment became effective on September 1, 1999. S.B. 1368, 76th Leg., Reg. Sess., Gen & Spec. Laws, Ch. 62, §20.01 p. 420 (1999). So at the time of trial, the statute actually read:

> If a creditor has not agreed with an obligor to charge the obligor any interest, the creditor may charge and receive . . . legal interest at the rate of six percent a year on the principal amount of the credit extended beginning on the 30th day after the date on which the amount is due . . . .

TEX. FIN. CODE ANN. §302.002 (Vernon Supp. 2003). As can be seen, nothing is said about applying to "*all* contracts ascertaining the amount payable." (Emphasis added).

Moreover, reading the amendment in its context leads us to conclude that it does not even apply to the transaction at bar. That this is true can be seen simply from reading the definitions of "creditor" and "obligor." The former denotes a "person who loans money or otherwise extends credit," *id.* at §301.002(a)(3), while the latter describes one "to whom money is loaned or credit is otherwise extended." *Id.* at §301.002(a)(13). Neither definition encompasses a mere judgment creditor, such as Maxus, or judgment debtor, such as NGC.[12] *Id.* at §301.002(a)(3) & (13)(A). Nor did Maxus sue NGC to collect a loan or credit extended by Maxus to NGC.

In short, by amending the section in 1999 and replacing the old language with new and distinct words, the legislature effectively repealed the proviso upon which NGC relies.

---

[12]A judgment creditor is one to whom a money judgment is payable, TEX. FIN. CODE ANN. §301.002(a)(5) (Vernon Supp. 2003), while a judgment debtor is one obligated to pay a money judgment. *Id.* at §301.002(a)(6).

18

*State v. Eversole*, 889 S.W.2d 418, 425 (Tex. App.--Houston [14th Dist.] 1994, pet. ref'd) (holding it to be a general rule of statutory construction that when the legislature amends a particular statute and omits certain language of the former statute in its amended version, the legislature specifically intends that the omitted portion is to no longer be the law); *Eoff v. Pace*, 25 S.W.2d 264, 266-67 (Tex. Civ. App.--Eastland 1930), *rev'd on other grounds*, 48 S.W.2d 956 (Tex. Comm'n App. 1932) (stating that where a statute is revised and some parts of the original act are omitted from the amendment, the parts which are omitted cannot be revived by construction, but are to be considered as annulled); *see Gateley v. Humphrey,* 151 Tex. 588, 254 S.W.2d 98, 101 (1952) (holding that the fact that significant words are omitted from the re-enactment or amendment of a statute imports a conclusive presumption that the legislature intended to exclude the object theretofore accomplished by the abandoned words). Moreover, the enabling legislation accompanying the change said nothing about retaining the vitality of the old statute for any purpose. So, because the provision on which NGC relies was repealed before final judgment was entered at bar, the trial court did not err in refusing to apply it. *See Quick v. City of Austin*, 7 S.W.3d 109, 128 (Tex. 1999) (stating that when a right or remedy is dependent on a statute, the unqualified repeal of that statute operates to deprive the party of all such rights that have not become vested or reduced to final judgment); *Phil H. Pierce Co. v. Watkins*, 114 Tex. 153, 263 S.W. 905, 907 (1924) (holding that the repeal of a statute without a

savings clause in the repealing law requires the remedies under the former statute to give way to those provided for in the new one).[13]

We do not ignore that NGC cites *Aquila Southwest Pipeline, Inc. v. Harmony Exploration, Inc.*, 48 S.W.3d 225 (Tex. App.--San Antonio 2001, pet. denied) for the proposition that the old version of §302.002 applies despite the 1999 amendments. We further acknowledge that the court in *Aquila* applied the old statute to the dispute there involved. So too did it note that the statute had been amended. Yet, nowhere in the opinion did the intermediate appellate court expressly address the effect of the amendment upon the dispute. Furthermore, whether that issue was considered by the court is unknown. Indeed, it seems as though the panel was concerned with whether interest was to be calculated pursuant to statute or rules of equity as described in *Johnson & Higgins, Inc. v. Kenneco Energy*, 962 S.W.2d 507 (Tex. 1998), not whether the pre-1999 version of §302.002 remained in existence.

More importantly, in *Johnson & Higgins* the Supreme Court uttered a comment which proves quite telling. In footnote 9, it concluded by saying that: "[i]n any event, *at the time the trial court's judgment was rendered in this case*, section 6 was the operative provision." *Id*. at 528 n.9 (Emphasis added). From the italicized portion of the phrase, it

---

[13]Our holding is simply a reiteration of the rule dictating that "a litigant has no vested right in a remedy, and that remedial statutes are valid and control the litigation from the date they become law, and all proceedings taken thereafter must be under the new law." *Phil H. Pierce Co. v. Watkins*, 114 Tex. 153, 263 S.W. 905, 907 (1924); *Price Pfister, Inc. v. Moore & Kimmey, Inc.*, 48 S.W.3d 341, 354 (Tex. App.--Houston [14th Dist.] 2001, pet. denied). Given that statutes relating to damages are remedial, *see Price Pfister, Inc. v. Moore & Kimmey, Inc.*, 48 S.W.3d at 354 (stating that one does not have a vested right to a particular measure of damages for a breach of contract), and that prejudgment interest is simply a form of damages, *Johnson & Higgins, Inc. v. Kenneco Energy*, 962 S.W.2d 507, 528 (Tex. 1998), then any amendment to §302.002 in 1999 applied to this case and controlled at the time of judgment. And, since at the time of judgment, the statutory rate of interest mentioned in §302.002 did not encompass disputes of the ilk at bar, the trial court was not obligated to calculate interest under §302.002.

20

is apparent the Supreme Court believed that the statute in existence *at the time the judgment was signed* controls.  In view of this and the fact that *Aquila* does not expressly address the particular dispute before us, we choose not to follow *Aquila*.

*Tolling of Interest*

Regarding the tolling matter, NGC posits that the accrual of prejudgment interest should have been tolled, per §304.108 of the Texas Finance Code, for the time period during which the cause was previously on appeal.[14]  Assuming *arguendo* that §304.108 applies to suits other than for wrongful death, personal injury or property damage, *see* TEX. FIN. CODE ANN. §304.101 (Vernon Supp. 2003) (limiting application of the subtitle to such claims), we nevertheless conclude that the argument is meritless.

According to NGC, the two years in question was needed to secure reversal of a summary judgment purportedly founded upon a false affidavit.  Yet, we did not reverse the summary judgment on that basis.  Instead, we reversed because Maxus failed to attach to its motion for summary judgment various records upon which Vandivere relied when formulating the opinions expressed in his affidavit.  *Natural Gas Clearinghouse v. Midgard Energy Co.*, 23 S.W.3d at 378-79.  Moreover, of the three points urged by NGC implicating that affidavit and mentioned in our prior opinion, none involved the allegation that the affiant sponsored a false document.  *Id.* at 378.  Finally, NGC has not cited us to any finding made by any court of competent jurisdiction concluding that any part of the affidavit in question was false.  Given this, the trial court did not abuse its discretion in refusing to

---

[14]The statute reads: "In addition to the exceptions provided by Section 304.105, a court may order that prejudgment interest does not accrue during periods of delay in the trial."  TEX. FIN. CODE ANN. §304.108(a) (Vernon Supp. 2003).

21

toll the accrual of prejudgment interest.  *See City of Alamo v. Casas*, 960 S.W.2d 240, 260 (Tex. App.--Corpus Christi 1997, pet. denied) (holding that decisions regarding whether to toll the accrual of prejudgment interest lie within the trial court's discretion).

### Issues Ten and Eleven - Attorney's Fees

The final two issues before us concern the attorney's fees awarded to Maxus.  NGC initially contends that the trial court erred in awarding Maxus fees incurred while unsuccessfully defending a summary judgment on appeal.  Then it argues that fees related to litigation against Transok and the prosecution of the fraud chose-in-action against NGC were not properly segregated from the total award.  We sustain the first issue and overrule the last.

#### Fees Incurred During Prior Appeal

The trial court found that "fees incurred by Maxus on a prior appeal were reasonably incurred in the prosecution of this matter" and "are properly included as reasonable attorney's fees . . . ."  Though their amount went unspecified by the trial court, the fees alluded to were incurred when Maxus attempted to defend on appeal a final summary judgment entered by the trial court.   As previously mentioned, we reversed that summary judgment and remanded the cause for a new trial.  *See Natural Gas Clearinghouse v. Midgard Energy Co.*, 23 S.W.3d at 380.

Authority holds that an appellee may not recover attorney's fees related to unsuccessfully defending a judgment on appeal.  *Picket v. Keene*, 47 S.W.2d 67, 78 (Tex. App.--Corpus Christi 2001, no pet.); *Smith v.  Smith*, 757 S.W.2d 422, 426 (Tex. App.--

22

Dallas 1988, writ denied); *Brown v. Eubank,* 443 S.W.2d 386, 391 (Tex. Civ. App.--Dallas 1969, no writ) (refusing to award the appellee costs incurred in unsuccessfully defending a prior appeal). To hold otherwise would be to penalize a litigant for pursuing a successful appeal. *Smith v. Smith*, 757 S.W.2d at 426. Given this, the decision of the trial court to award Maxus attorney's fees for unsuccessfully defending on appeal a prior summary judgment did not comport with guiding rules and principles and, therefore, constituted an abuse of discretion. *Caldwell & Hurst v. Myers*, 714 S.W.2d 63, 65 (Tex. App.--Houston [14th Dist.] 1986, writ ref'd n.r.e.) (stating that a trial court has discretion in determining the amount of fees to award but not in determining whether to award fees).

*Segregation of Fees*

NGC next complains of two ways in which Maxus allegedly failed to segregate attorney's fees. The first concerns fees incurred in prosecuting its claim against Transok, a party ultimately dismissed from the suit. The second involves the purported failure to distinguish between fees incurred by Maxus while prosecuting its claim of fraud against NGC from those incurred in pursuing its claim of breached contract.

As to the former, counsel for Maxus testified that the total amount of fees incurred in prosecuting the entire suit was $525,000. From that sum, he deducted $25,000 as representative of the fees related to the Transok claims. Thereafter, the trial court awarded Maxus only $462,597. Before us, NGC asserts that "far too little has been deducted for the four and a half years of legal fees incurred by Maxus in prosecuting its claims against Transok." In making this argument, however, NGC fails to explain what other sums it thinks should have been excluded. Instead, it merely refers to an exhibit of

23

Maxus purporting to illustrate the fees incurred and concludes that "[a]lthough partially redacted, the descriptions in those statements reflect significant Transok-related fees." How and why they do also goes unmentioned. To adequately brief an issue, a litigant must do more than provide us with mere conclusions. He must analyze and explain his contention. *Wilkinson v. Dallas/Fort Worth Intern. Airport Board,* 54 S.W.3d 1, 19-20 (Tex. App.--Dallas 2001, pet. denied). It is not our duty to create argument where none is provided. So, in failing to explain its contention or direct us to the specific "significant Transok-related fees" to which it alludes, NGC did not adequately brief the issue. And, this results in its waiver. *Id.* at 20 (holding that the failure to adequately brief an issue results in the waiver of the issue).

Nevertheless, and as previously mentioned, there appears of record evidence that the "Transok-related fees" were segregated from the entire amount sought from NGC. Moreover, the trial court excluded from its award the segregated sum plus more. Consequently, we cannot say that the award constituted an abuse of discretion. *See Wilemon v. Wilemon*, 930 S.W.2d 290, 294 (Tex. App.--Waco 1996, no writ) (holding that a trial court does not abuse its discretion as long as some evidence of substantive and probative force supports its decision).

As to the second contention, we acknowledge that one seeking fees has the burden to distinguish between those incurred while prosecuting a claim for which fees may be awarded from all others. *Aetna Cas. & Sur. v. Wild*, 944 S.W.2d 37, 40-41 (Tex. App.--Amarillo 1997, writ denied). Yet, as with all rules, this too has its exceptions. For instance, segregation is not required "when the causes of action . . . are dependent upon

24

the same set of facts or circumstances and thus are 'intertwined to the point of being inseparable' . . . ." *Stewart Title Guaranty Co. v. Sterling*, 822 S.W.2d 1, 11-12 (Tex. 1991), *quoting Gill Sav. Ass'n v. Chair King, Inc.*, 783 S.W.2d 674 (Tex. App.--Houston [14th Dist.] 1989), *modified*, 797 S.W.2d 31 (Tex. 1990). Should that circumstance occur, then the entire amount covering all claims may be awarded. *Id.*

Here, counsel for Maxus testified that the facts pertinent to the fraud and contract claims were so intertwined that the fees could not be segregated. NGC acknowledges the argument in its brief. Yet, to evince that the trial court erred in agreeing with Maxus' counsel, NGC simply asserts that he "admitted, the fraud claim accrued in 1990 or 1991, when the alleged misrepresentation occurred, while the contract claim did not accrue until 1993, when the alleged breach occurred." Then it concludes by saying that the "proof needed to establish fraud -- including a knowing misrepresentation, reliance and intent to induce reliance -- was not common to the proof of the contract claim, which turned on contract interpretation, as applied to largely undisputed facts." Much like the preceding argument, this one too lacks substantive analysis and explanation. Why it matters that the claims purportedly accrued on different dates goes totally undeveloped. Similarly missing is any explanation as to why the same representations giving rise to the contract and underlying the claim of breach may not also evince fraud. This is of import because it is quite conceivable that facts tending to prove a claim of breached contract may also establish fraud. *See e.g., Pegasus Energy Group , Inc. v. Cheyenne Petroleum Co.*, 3 S.W.3d 112, 131 (Tex. App.--Corpus Christi 1999, pet. denied) (wherein the court recognized that the facts underlying the claim of fraud were intertwined with those

25

underlying the claim of breached contract). And, that the two claims may have different elements is irrelevant since the focus lies upon the commonality of the facts involved, as opposed to the identity between the elements of each cause. So, again, we are left to address a briefing void, and because we are, the contention is waived. *Smith v. Comm'n for Lawyer Discipline,* 42 S.W.3d 362, 364 (Tex. App.--Houston [14th Dist.] 2001, no pet.)

Accordingly, we sever from the judgment, reverse, and remand to the trial court for further proceedings that portion of the trial court's judgment which awards Maxus attorney's fees of $462,597 "through trial." In all other respects, the judgment of the trial court is affirmed.

Brian Quinn
Justice