**John W. BREITENFELD, Appellant,**

v.

**SAS INSTITUTE, INC., Appellee.**

**No. 05–04–00131–CV.**

Court of Appeals of Texas,
Dallas.

Oct. 28, 2004.

F. Colin Durham, Jr., Collins, Norman & Basinger, P.C., Dallas, for appellant.

Curtis Dean Herms, Nancy L. Patterson, Baker & Hostetler, LP, Houston, for appellee.

Before Justices FITZGERALD, RICHTER, and LANG.

## OPINION

Opinion By Justice LANG.

In this action, John W. Breitenfeld appeals the summary judgment rendered against him and in favor of SAS Institute, Inc., his former employer, which required him to refund $49,443.50 of sales bonus payments. Specifically, on appeal, Breitenfeld claims that: (1) the trial court erred in granting SAS's motion for summary judgment; and (2) the trial court erred in denying Breitenfeld's motion for summary judgment. For the reasons set out below, we reverse and render in part, and affirm in part, the trial court's judgment.

### 1. Procedural History of the Case

SAS sued Breitenfeld, its former sales representative, pursuant to a sales compensation plan for the return of "bonus monies" paid to Breitenfeld for sales that were cancelled by the customer. Breitenfeld counterclaimed against SAS seeking a declaratory judgment and his attorney's fees under Chapter 37 of the Texas Civil Practice and Remedies Code. It was Breitenfeld's contention that the sales plan did not require him to return the sales bonuses. Rather, he claimed he could retain the bonus payments since the sales were cancelled before he left his employment at SAS. Breitenfeld claimed that the only method for recovery of bonuses on cancelled sales described in the plan was that SAS could deduct monies from Breitenfeld's paycheck.

Both parties asserted in their summary judgment motions that there were no genuine issues of material fact, and that the resolution of the case turned upon the trial court's interpretation of an unambiguous contract. The trial court granted SAS's cross-motion for summary judgment and denied Breitenfeld's motion for summary judgment.

### 2. Factual Content

Soon after being employed by SAS, Breitenfeld signed the Self–Directed Bonus Plan Acknowledgment Form which stated he received, read, and understood the terms and conditions of the 2001 Self–Directed Bonus Plan for Field Sales Representatives SAS Institute, SAS Americas. Almost a year later, Breitenfeld signed the 2002 Compensation Plan Acknowledgment Form which stated he received, read, and

understood the terms and conditions of the 2002 Sales Compensation Plan for Solutions Sales Representatives SAS Institute, SAS Americas. Both Plans provided that sales representatives may earn sales bonuses based on sales of SAS's new software products. The bonuses were to be calculated and paid on a quarterly basis. The 2002 Plan superceded "all prior sales compensation plans or programs, and all previous oral or written agreements or representations" effective January 1, 2002.

In December 2001, Breitenfeld made a $1 million sale to Methodist Healthcare System ("Methodist") in Houston, Texas. In February and March 2002, he was paid sales bonuses totaling $49,443.50 based on the Methodist sale. On April 16, 2002, SAS received notice from Methodist that it was cancelling the sale for which Breitenfeld had received the bonus payments. Breitenfeld resigned from employment with SAS on June 7, 2002. On June 24, 2002, SAS demanded that Breitenfeld return the bonus payments. SAS claimed its demand was made in accordance with: (1) sections 5(b) and 5(c) of the 2001 and 2002 Plans; and (2) the cancellation provisions within the 2001 and 2002 Acknowledgment Forms to each Plan. Breitenfeld refused to make repayment.

The 2001 Plan, section 5(b) states:

If a sales rep terminates employment with SAS Institute and subsequently, sales order(s) that were part of the bonus calculation are cancelled, the sales rep will be required to pay back to SAS the portion of the bonus that was paid based upon the cancelled sales.

The 2002 Plan contains similar language at section 5(b) which states:

If a sales rep terminates employment with. SAS Institute and subsequently, sales order(s) that were part of the bonus calculation are cancelled, refunded, or the invoice is credited, the sales rep will be required to pay back to SAS the portion of the bonus that was paid based upon the cancelled sales.

Section 5(c) of the 2002 Plan, entitled "Termination of Employment," states:

Cancellations will be deducted from sales credit. If invoices for sales order(s) that were part of the bonus calculation are not paid within 90 days of the sales rep's termination, those sales credits will be forfeited and no bonus will be owed for those sales.

Both the 2001 Plan and 2002 Plan contain similar general language regarding the crediting of sales and the effect of the cancellation on sales bonus payments. The 2001 Plan states in sections 3(a) and (b) that the "bonus is based on new sales credit" and that "sales credit will be reduced for cancellations." Section 3(b) of the 2002 Plan is more specific. It says that the "sales bonus is based on sales credit for new software products resulting in new software revenue for SAS." Also, section 3(h) of the 2002 Plan provides that "cancellations, credits, and refunds will be deducted from sales credit for the sales rep" and that "sales credit will be reduced for cancellations based on the original sales credit issued." Finally, the 2001 and 2002 Acknowledgment Forms contain this language:

If my employment with SAS terminates, I agree and authorize SAS to deduct from my paycheck any bonus overpayment amount I owe under subsection 5(b) as a result of cancelled sales.

The argument between the parties is fairly clear. They claim the resolution of this case turns on what the agreements do not say. First, Breitenfeld contends that the agreements are silent and do not address the situation where a sales representative receives bonus payments, the sale is then cancelled before the sales representa-

tive leaves employment at SAS, and no deduction was made from the sales representative's compensation for the cancelled sale before he left the company. He argues that if the parties did not address a particular situation in the clear language of the agreements, the court cannot change or add to the terms. On the other hand, SAS contends that there is no language in the agreements stating that a sales representative may retain a bonus for a cancelled sale. Rather, it says that acceptance of Breitenfeld's "narrow contract interpretation" would render meaningless the many parts of the agreements which make it clear that the parties' reasonable intent was that bonuses would be based upon actual sales which were not cancelled, regardless of the time of cancellation.

### 3. Standard of Review

This Court reviews a summary judgment de novo to determine whether a party's right to prevail is established as a matter of law. *Dickey v. Club Corp. of Am.,* 12 S.W.3d 172, 175 (Tex.App.-Dallas 2000, pet. denied). The standards for reviewing a traditional summary judgment are well-established. *See Nixon v. Mr. Prop. Mgmt. Co.,* 690 S.W.2d 546, 548–49 (Tex.1985). A party moving for traditional summary judgment carries the burden of establishing that no material fact issue exists and that it is entitled to judgment as a matter of law. Tex.R. Civ. P. 166a(c); *M.D. Anderson Hosp. & Tumor Inst. v. Willrich,* 28 S.W.3d 22, 23 (Tex.2000) (per curiam). When reviewing a motion for summary judgment, the court takes the nonmovant's evidence as true, indulges every reasonable inference in favor of the nonmovant, and resolves all doubts in favor of the nonmovant. *Willrich,* 28 S.W.3d at 23–24. To establish it is entitled to summary judgment, a defendant must either disprove an element of the plaintiff's

case or prove each element of an affirmative defense. *Lear Siegler, Inc. v. Perez,* 819 S.W.2d 470, 471 (Tex.1991).

Further, on cross-motions for summary judgment, each party bears the burden of establishing that it is entitled to judgment as a matter of law. *See Guynes v. Galveston County,* 861 S.W.2d 861, 862 (Tex. 1993). When the trial court grants one motion and denies the other, the reviewing court should determine all questions presented. *See Comm'rs Court of Titus County v. Agan,* 940 S.W.2d 77, 81 (Tex. 1997); *Jones v. Strauss,* 745 S.W.2d 898, 900 (Tex.1988). The reviewing court should render the judgment that the trial court should have rendered. *See Agan,* 940 S.W.2d at 81; *Members Mut. Ins. Co. v. Hermann Hosp.,* 664 S.W.2d 325, 328 (Tex.1984).

### 4. Refund of Sales Bonuses

#### a. Applicable Law

 Under Texas law, if there is no ambiguity in a written contract, "its construction and meaning become a question of law for the court to determine." *Dedier v. Grossman,* 454 S.W.2d 231, 234 (Tex. Civ.App.-Dallas 1970, writ ref'd n.r.e.). When interpreting an unambiguous contract, it is well established that "the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument." *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). In order to achieve this objective, "courts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of a contract so that none will be rendered meaningless." *Id.* Furthermore, "no single instrument taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *Id.* Thus, the court should consid-

er that the "intent of the parties must be taken from the agreement itself, not from the parties' present interpretation, and the agreement must be enforced as it is written." *Parts Indus. Corp. v. A.V.A. Servs., Inc.*, 104 S.W.3d 671, 678 (Tex.App.-Corpus Christi 2003, no pet.). This is often referred to as the "Four Corners Rule" which means that the intention of the parties is to be ascertained from the instrument as a whole and not from isolated parts thereof. *See, e.g., Stine v. Stewart*, 80 S.W.3d 586, 589 (Tex.2002) (per curiam); *Burrus Mills, Inc. v. Hein*, 378 S.W.2d 85, 88 (Tex.Civ.App.-Dallas 1964, writ dism'd); *Ervay, Inc. v. Wood*, 373 S.W.2d 380, 384 (Tex.Civ.App.-Dallas, 1963, writ ref'd n.r.e.). Moreover, a court will not change the contract merely because it or one of the parties comes to dislike its provisions or thinks that something else is needed. *Natural Gas Clearinghouse v. Midgard Energy Co.*, 113 S.W.3d 400, 407 (Tex.App.-Amarillo 2003, pet. denied) (citing *HECI Exploration Co. v. Neel*, 982 S.W.2d 881, 888–89 (Tex. 1998)). The court will not "ask about the subjective intent of the parties to the contract." *Vincent v. Bank of Am., N.A.*, 109 S.W.3d 856, 867 (Tex.App.-Dallas 2003, pet. denied). When the contract is unambiguous, the court should apply the pertinent rules of construction, apply the plain meaning of the contract language, and enforce the contract as written. *Id.*

### b. Application of Law to Facts

■ Breitenfeld's argument focuses on section 5(b) of the contract. Section 5(b) of the 2002 Plan provides:

> If a sales rep terminates employment with SAS Institute and *subsequently*, sales order(s) that were part of the bonus calculation are cancelled, refunded, or the invoice is credited, the sales rep will be required to pay back to SAS the portion of the bonus that was paid based upon the cancelled sales.

(Emphasis added.) Breitenfeld argues that section 5(b) does not compel a sales representative to refund bonuses for sales cancelled before he leaves employment at SAS. He asserts that under section 5(b) a sales representative would only be required to refund the bonuses if the sales contracts were cancelled *subsequent* to his termination of employment with SAS. In that vein, Breitenfeld contends that since the Methodist contract was cancelled before his employment was terminated, he is not obligated to return the bonus payments he received from the sale under section 5(b) of the 2002 Plan. Moreover, he says that the specific situation here is not addressed anywhere in the agreements. According to Breitenfeld, the other provisions of the agreements simply address situations where a cancellation of a sale occurs and it is agreed that a "deduction" may be made from future compensation while a sales representative is still employed by SAS. Since the cancellation took place *before* rather than *subsequent* to his termination and no "deduction" was made for the bonus related to the cancelled sale before he left SAS, there is simply no language in the agreements that requires him to refund the bonuses.

SAS turns the "no language in the agreements" argument around on Breitenfeld by arguing that no provision in the agreements provides that a salesperson can ever retain bonus payments for cancelled sales. Rather, SAS claims that the intent of the parties is clear that bonus payments may not be retained on cancelled sales. According to SAS, that intent may be inferred by reading provisions of the agreements which refer to "deductions" of sales bonuses for cancelled sales. Specifically, sections 5(b) and 5(c) of the 2002 Plan and provisions in the Acknowledgment Forms expressly authorize SAS to

deduct "bonus monies" due to cancelled sales. Additionally, sections 3(a) and (b) of the 2001 Plan state "sales credit will be reduced for cancellations." Section 3(b) of the 2002 Plan states that the "bonus is based on new sales credit" and that the "sales bonus is based on sales credit for new software products resulting in new software revenue for SAS." Finally, section 3(h) of the 2002 Plan expressly addresses SAS's intent for cancellations to be deducted from sales credit for the sales representatives.

■ We are not persuaded by SAS that the intention of the parties must be inferred from the terms of the agreements so that Breitenfeld cannot retain the bonus. The intention of the parties is expressed in the unambiguous terms of the agreement. SAS and Breitenfeld made an express agreement which addressed several ways SAS would recover bonuses for cancelled sales. All except one provision in the agreement, section 5(b) of the 2002 Plan, address deductions from future compensation of a salesperson. Section 5(b) of the 2002 Plan applies only where the cancellation transpires subsequent to a salesperson's termination. That simply did not happen here. In an unambiguous contract, we will not imply language, add to language, or interpret it other than pursuant to its plain meaning. *See Natural Gas Clearinghouse,* 113 S.W.3d at 407. We decide Breitenfeld's issue in his favor.

■ When all issues are submitted to the trial court on a motion for summary judgment and the court renders judgment, we determine all questions presented and render the judgment that the trial court should have rendered. *Agan,* 940 S.W.2d at 81. The pivotal issue for determination of both parties' summary judgment motions was whether Breitenfeld must repay the bonus under the agreements and the undisputed facts presented. No other damage claims were raised by either side. Having concluded that the agreement does not require repayment by Breitenfeld, SAS's motion for summary judgment should have been denied, and the motion for summary judgment for Breitenfeld, on that point, should have been granted. Accordingly, on that point, we reverse the trial court's summary judgment in favor of SAS and against Breitenfeld. Additionally, we render judgment in favor of Breitenfeld that SAS take nothing.

### 5. Attorney's Fees

■ One issue remains. Breitenfeld brought his counterclaim seeking a declaratory judgment pursuant to Chapter 37 of the Texas Civil Practice and Remedies Code. Pursuant thereto, he claimed entitlement to attorney's fees under section 37.009. Thus, in this case, we must also address the issue of the propriety of an award of attorney's fees in a suit for declaratory judgment. The Declaratory Judgments Act provides that the trial court may award reasonable and necessary attorney's fees. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (Vernon 1997). However, when a claim for declaratory relief is merely incidental to the issue at hand, attorney's fees are not recoverable. *See John G. & Marie Stella Kenedy Mem'l Found. v. Dewhurst,* 90 S.W.3d 268, 289 (Tex.2002) (holding claim for legislative enactment was incidental to title issue and attorney's fees were not authorized under Declaratory Judgments Act); *Hawk v. E.K. Arledge, Inc.,* 107 S.W.3d 79, 84 (Tex. App.-Eastland 2003, pet. denied) (finding declaratory relief incidental to title issue and attorney's fees were not recoverable). "A declaratory judgment action may not be used solely to obtain attorney's fees that are not otherwise authorized by statute or to settle disputes already pending before a court." *S.W. Guar. Trust Co. v.*

*Hardy Road 13.4 Joint Venture,* 981 S.W.2d 951, 956 (Tex.App.-Houston [1st Dist.] 1998, pet. denied).

Under section 37.009, the awarding of attorney's fees is within the discretion of the trial court. *Agan,* 940 S.W.2d at 77. However, attorney's fees are not authorized where a counterclaim requests a declaratory judgment that is the mirror image of a claim already asserted by an adversary in the suit. *See S.W. Guar. Trust Co.,* 981 S.W.2d at 956. The relief requested by Breitenfeld is such a claim. No attorney's fees may be awarded. Accordingly, we affirm the court's denial of Breitenfeld's motion for summary judgment as to his request for attorney's fees.

### 6. Conclusion

Based upon the foregoing, we reverse the summary judgment in favor of SAS and against Breitenfeld in part and render judgment in favor of Breitenfeld that SAS take nothing on its claim for refund of sales bonuses. We affirm that part of the summary judgment denying Breitenfeld's prayer for attorney's fees.

FITZGERALD, J. dissenting.

Opinion by Justice FITZGERALD, dissenting.

I agree with the majority concerning the law applicable to this case. When we interpret an unambiguous contract, our primary concern is to ascertain the true intentions of the parties as those intentions are expressed in the instrument. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex.1983). In this case, I believe the parties to the employment contracts at issue intended to prohibit an employee from retaining a bonus he received on a sales contract that is later cancelled. Accordingly, I respectfully dissent.

The majority sets forth the provisions of both the 2001 Plan and the 2002 Plan that address cancelled sales. In each of these provisions, the value of the unearned bonus is returned to the employer. In the normal course of events, if a sales contract were cancelled, then "sales credit for the cancelled sales [would] be deducted from the sales rep's current sales credit." Thus, a sales representative who received an unearned bonus would reimburse SAS the value of that bonus from his future compensation. Once the cancellation occurred, the sales representative owed SAS the amount of the unearned bonus.

Similarly, in the case of an employee who left the company after receiving a bonus, if the contract were cancelled, both Plans required the former employee "to pay back to SAS Institute the portion of the bonus that was paid based upon the cancelled sales." Again, once the cancellation occurred, the former sales representative owed SAS the amount of the unearned bonus. In the case of a former employee, because he would receive no future compensation from which the bonus could be deducted, his obligation was simply to pay back the amount of the bonus.

The majority concludes that Breitenfeld's situation is not covered by either of these contractual provisions, and, therefore, Breitenfeld is entitled to retain his unearned bonus. I disagree that Breitenfeld's situation is not covered by the two Plans. Breitenfeld was unquestionably an employee when the sales contract was cancelled. At that point in time, he owed SAS the value of his unearned bonus, and the company had the right to deduct that amount from his future compensation. Breitenfeld attempted to thwart this operation of the contractual provision by resigning from his employment with SAS before the compensation adjustment was scheduled to be made.

The majority's decision allows Breitenfeld to manipulate the mandates of the Plans by focusing on the time of his resignation—after the cancellation, but before his next quarterly payment—rather than on the parties' clear intent that unearned bonuses must be returned to the company. Because I find such a result contrary to the parties' agreements and fundamentally inequitable, I respectfully dissent.