Curran, Dennis J., J.
INTRODUCTION
Pursuant to Mass.R.Civ.P. 56, the defendant Applied Manufacturing Technologies, Inc. (“AMT”), brings this motion for summary judgment against the plaintiff, Aspen Technology, Inc. (“AspenTech”). AspenTech filed a four-count complaint against AMT *463 alleging breach of contract (count I), breach of the covenant of good faith and fair dealing (count II), violation of G.L.c. 93A (count III), and intentional interference with prospective economic advantage (count IV). AMT has moved for summary judgment as to all counts.
In response to AMT’s motion for summary judgment, AspenTech filed its own motion for partial summary judgment, asking this court to grant summary judgment as to its breach of contract claim and a permanent injunction. For the foregoing reasons, AMT’s motion for summary judgment is hereby ALLOWED in part and DENIED in part and AspenTech’s cross motion for summary judgment is DENIED.
FACTUAL BACKGROUND
AspenTech is a Delaware corporation with a principal place of business in Cambridge, Massachusetts, whose business consists of licensing software and selling related consulting services to process manufacturers in the petroleum, chemical, and pharmaceutical industries. A portion of AspenTech’s software products are used and licensed in assisting manufacturers in “process modeling.” Process modeling allows engineers to simulate and manipulate chemical reactions on computers to optimize a particular manufacturing process.
Specifically, and pertinent to the circumstances before the court, AspenTech’s various “process control” software receives and examines data from the process units, examines it, and then calculates the most efficient method to operate the process. There are three distinct levels of control in such a refining process. The most basic level is the “distributed control system” or “DCS.” In DCS, sensors and activators control the flow of a material through a process unit. Based on pre-established set points, the DCS opens or closes valves or other devices to alter conditions in the refining units in an attempt to maximize the refining process.
The second layer of control is “advanced process control" or “APC.” APC uses linear equations and models to define setpoints on the DCS for an individual refinery or application. AspenTech’s APC software is called “DMCPlus.” Additionally, APC may utilize modeling or inferential software in making DCS adjustments. Modeling software provides mathematical models of the refining process, which are then compared with theoretical models to adjust the DCS. Inferential software provides calculations of properties in the refining process which cannot be directly measured during the refining process. AspenTech has software in these two areas — "Aspen hydrotreater" being the modeling software and “Aspen IQ” being the inferential software.
The third, and most advanced, layer of control is known as “real time optimization” or “RTO.” RTO uses non-linear or open equations and models to optimize plant operations globally. AspenTech licenses RTO software under the name “AspenPlus Optimizer.”
In 2002, Steven Finlayson (“Mr. Finlayson”), then head of AspenTech’s Services Division, left AspenTech. In 2003, Mr. Finlayson formed AMT. AMT is a Texas corporation that provides engineering services to refineries to study and/or implement APC or RTO services. AMT does not develop or sell software.
In 2003, AspenTech and AMT entered into a “Systems Integration Agreement” (“SI Agreement”) which, among other things, provided AMT with a number of software “internal use licenses” for AspenTech Software. Pursuant to the terms of the SI Agreement, AMT had the right to install a limited number of copies of AspenTech’s software on their computers for their own internal use. There were several conditions in the agreement that constrained AMTs use of the software, two of which are relevant here.
Specifically, section 2.7.2 provides that AMT agreed not to:
. . . directly or indirectly interface, integrate, or interconnect AspenTech software to or with other software products that compete with AspenTech. Notwithstanding any other provision in this Agreement, AspenTech grants [AMT] the right to interface the Aspen Plus Optimization technology to competitors’ multivariable control technologies as part of client service projects.
If at any time during the term of this Agreement, AspenTech no longer offers a fully supported, commercial, open-equation modeling and optimization system (such as Aspen Plus version 11), the restriction outlined in this section 2.7.2 will be removed.
Section 2.8 provides:
SI agrees to exclusively use AspenTech software products (excluding those utilized specifically for advanced process control, but including all others not listed in Exhibit A) to provide, perform, or engage in any services or other commercial offerings with or for the benefit of the following Aspen-Tech customers:
BP
ExxonMobil
The Dow Chemical Company
BASF
ATOFINA
However, on a case-by-case basis, by mutual agreement, SI and AspenTech may identify sales opportunities, jointly bid on and execute projects for any such customer.
In 2005, Total Petrochemicals[1] (‘Total") invited both AspenTech and AMT to bid on a services contract. Specifically, the contract pertained to certain maximization and efficiency processes with regard to Total’s GHT hydrotreater unit at its Port Arthur, Texas refinery. A hydrotreater is operated as part of the manufacturing process whereby crude oil is converted into gasoline and/or other gases. Total eventually awarded the contract to AMT. As part of its bid proposal, AMT *464 touted its contractor/subcontractor relationship with a company named Axens. Axens is a company that licenses a process to create inferential calculations that can be utilized in the APC process in the hydro-treater. Axens’s calculations software is called “Axens Prime G+ software.” After Total awarded AMT the contract, AspenTech brought this action, claiming that AMT breached the SI Agreement.
DISCUSSION
Summary Judgment Standard
Summary judgment is appropriate when the summary judgment record shows that “there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.” Mass.R.Civ.P. 56(c); DuPont v. Commissioner of Corrections, 448 Mass. 389, 397 (2007). A fact is “material” if it would affect the outcome of the suit. Carey v. New England Organ Bank, 446 Mass. 270, 278 (2006); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is “genuine” where a reasonable finder of fact could return a verdict for the non-moving party. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991), citing Anderson, 477 U.S. at 252. The moving party bears the initial burden of demonstrating the absence of a triable issue and that the summary judgment record entitles him to judgment as a matter of law. Ng Brothers Construction, Inc. v. Cranney, 436 Mass. 638, 644 (2002), citing Pederson v. Time, Inc., 404 Mass. 14, 17 (1989); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991). The moving party may satisfy its burden by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the non-moving party has no reasonable expectation of proving an essential element of his case at trial. Flesner, 410 Mass. at 809; Kourouvacilis, 410 Mass. at 716 (adopting reasoning contained in Celotex Corp. v. Catrett, 477 U.S. 317 (1986), that “the burden on the moving party may be discharged by ‘showing’ . . . that there is an absence of evidence to support the nonmoving party’s case”).
In reviewing a motion for summary judgment, the court views the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in his favor. Jupin v. Kask, 447 Mass. 141, 143 (2006), citing Coveney v. President & Trustees of the College of the Holy Cross, 388 Mass. 16, 17 (1983); see Simplex Technologies, Inc. v. Liberty Mutual Insurance Co., 429 Mass. 196, 197 (1999). If the moving party has carried its burden, and the plaintiff has not responded with specific facts to establish a genuine, triable issue, the court shall grant the motion for summary judgment. Community National Bank v. Dawes, 369 Mass. 550, 554 (1976); see Ng Brothers, 436 Mass. at 644 (stating that, even where the facts are disputed, “summary judgment is still available if the party with the burden of proof at trial . . . fails to present in the summary judgment record, taking everything it says as true and drawing all reasonable inferences in its favor, sufficient facts to warrant a finding in its favor”), citing White v. University of Massachusetts at Boston, 410 Mass. 553, 557 (1991).
Choice of Law
As a preliminary matter, the court must determine which substantive law to apply to the facts of this case. Section 12 of the SI Agreement provides:
[t]his Agreement shall be governed by and construed in accordance with the laws of the State of Texas, excluding its conflicts of laws rules, regardless of where any action may be brought. [AMT] agrees to submit to the non-exclusive jurisdiction of state and federal courts of the State of Texas.
Under Massachusetts law, parties to a transaction may select the law governing their relationship provided that enforcement of that agreement is fair and reasonable. See, e.g., Stagecoach Transportation, Inc. v. Shuttle, 50 Mass.App.Ct. 812, 817-18 (2001), citing Morris v. Watsco, Inc., 385 Mass. 672, 674 (1982). In this case, there is nothing in the record that suggests that it would be unfair or unreasonable to allow Texas law to govern the contract claim.
This court will also apply Texas law to AspenTech’s non-contractual claims. Massachusetts follows a “functional” choice of law approach to best represent the interests of the parties, the states involved, and the interstate system as a whole. Bushkin Associates, Inc. v. Raytheon Co., 393 Mass. 622, 630-32 (1985). Under such an approach, and guided by the Restatement (Second) of Conflict ofLaws (1971),[2] this court will apply the local law of the state that has the most significant relationship to the transaction and the parties. Id.
In this case, it is apparent that the state with the most significant relationship to the transaction and the parties is Texas. AMT is incorporated in Texas and AspenTech’s Services Division is located there. The negotiations surrounding the SI agreement and its signing took place in Texas, as did the alleged unlawful conduct. Furthermore, Texas, as the place where the injury allegedly took place, has a strong incentive in seeing that any harm that may have occurred is redressed. While AspenTech’s principal place of business is in Massachusetts, this fact, without more, is not enough to overcome the significant relationship that Texas has to the underlying transaction, alleged injury, and parties. See Terra Nova v. Fray-Witzer, 449 Mass. 406, 411-12 (2007) (court applied New Jersey law where insurance agreement was entered into, and plaintiffs were from, New Jersey). The court will, therefore, apply Texas’s substantive law to AspenTech’s breach of contract and non-contractual claims.
AMTS MOTION FOR SUMMARY JUDGMENT I. Breach of Contract
AspenTech’s breach of contract claim is based on two acts: (1) AMTs proposal to use software that competes with AspenTech’s in violation of section *465 2.7.2 of the SI agreement and AMT’s proposal to use non-AspenTech software for RTO in conjunction with services offered for Total in violation of section 2.8; and (2) AMTs actual interconnection of software that competes with AspenTech’s in violation of section 2.7.2.
Under Texas law, a party claiming breach of contract must prove the following four elements: (1) that there was a valid contract; (2) that the plaintiff performed or tendered performance; (3) that the defendant breached the contract; and (4) that the plaintiff was damaged as a result of that breach. Aquila Southwest Pipeline, Inc. v. Harmony Exploration, Inc., 48 S.W.3d 225, 235 (Tex.App. 2001). If there is no ambiguity in a written contract, its construction and meaning is a question of law for the court to determine. Breitenfeld v. SAS Institute, Inc., 147 S.W.3d 672, 676 (Tex.App. 2004). The object for the court when interpreting a contract is to ascertain the true intentions of the parties as expressed by the agreement. Id., citing Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983). In order to achieve this objective, the court should take into consideration, and give meaning to, all parts of the contract; no single provision will control. Id.
When interpreting a contract, the court will consider the intent of the parties at the time the contract was entered into as taken from the agreement itself, and enforce the agreement as it is written, not from the parties’ present interpretations. Breitenfeld, 147 S.W.3d at 677, citing Parts Industries Corp. v. A.V.A. Services, Inc., 104 S.W.3d 671, 678 (Tex.App. 2003). Furthermore, the court will not change the contract merely because one party is dissatisfied with its content or thinks something else is needed. Natural Gas Clearinghouse v. Midguard Energy Co., 113 S.W.3d 400, 407 (Tex.App. 2003). The court also will not inquire into the subjective intent of the parties to the contract. Vincent v. Bank of America, N.A., 109 S.W.3d 856, 867 (Tex.App. 2003). Thus, when the contract is unambiguous, the court will apply the pertinent rules of construction, apply the plain meaning of the contract’s language, and enforce it as it is written. Id.
A. AMTs Proposal
The gravamen of AspenTech’s claim is that AMT proposed to interface, integrate, or interconnect AspenTech’s software to competing software, thereby breaching section 2.7.2 of the SI Agreement. AspenT-ech also argues that by proposing to use non-Aspen-Tech RTO software in its services contract bid for Total, AMT violated section 2.8 of the SI Agreement. In order for this court to determine whether summary judgment is appropriate on these claims, it must first interpret the agreement in question to determine what it is that these respective provisions prohibit. After reviewing the language in the agreement, this court concludes that AspenTech’s argument on these grounds is without merit.
Section 2.7.2 of the SI Agreement provides, in pertinent part, that: “(d)uring the term of this Agreement SI will not, without the express written consent of Aspen-Tech, directly or indirectly interface, integrate or interconnect AspenTech software to or with other software products that compete with AspenTech.” The plain meaning of the agreement language clearly prohibits AMT from “interfacing], integrating], or interconnecting]” — all actions that already took place or that are presently occurring. By contrast, “to propose” is to set forth for acceptance or rejection. See Merriam-Webster Online, http://www.m-w.com/dictionaiy/propose. Proposing, therefore, is an act that looks to the future.
Here, there is no language in section 2.7.2 that prohibits the license holder from proposing to use software that competes with AspenTech’s. Rather, the plain language of the contract prohibits only the actual act of interfacing, interconnecting, or integrating AspenTech’s software with competing software. Accordingly, so much of AspenTech’s complaint that is grounded upon AMT’s alleged proposal to interface, integrate, or interconnect must fail as a matter of law because such actions are not violative of the contract. As a result, AspenTech’s claim that AMT violated section 2.7.2 by proposing an interconnection must fail. See, e.g., Trahan v. Lone Star Title Company of El Paso, Inc., No. 08-05-00293-CV, 2007 WL 2141902, at *13 (Tex.App. July 26, 2007) (plaintiffs failed to raise a genuine issue of material fact as to breach of contract claim where no evidence was offered to suggest that acts in question breached the agreement).
Likewise, AspenTech’s claim that AMT violated section 2.8 of the SI Agreement must fail. That provision of the SI Agreement provides that AMT “agrees to exclusively use AspenTech software products [excluding APC software] to provide, perform, or engage in any services . . . [for customer Total]...” As in section 2.7.2, there is no language in section 2.8 that prohibits AMT from proposing the use of non-AspenTech software products. Rather, the language clearly prohibits only the use of non-AspenTech software products when servicing the specific customers. Because AspenTech’s complaint focuses only on AMTs proposal and does not allege, nor does the record support, any actual use by AMT of non-AspenTech software in any RTO services to Total, AMT did not violate section 2.8 and, thus, AspenTech’s claim must fail as a matter of law. See id. For these reasons, so much of AMTs Motion for Summary Judgment with regard to AspenTech’s claim based on AMTs proposal is hereby ALLOWED.
B. AMTs Interconnection
AspenTech also alleges that AMT did in fact interconnect AspenTech’s software to competing software, and that this was a breach of section 2.7.2 of the SI Agreement. AMT first argues that section 2.7.2 applies only to RTO. Secondly, AMT argues that even if section 2.7.2 applies to APC, Axens Prime G+ is not software that competes with AspenTech. Third, AMT argues that even if they did breach the SI Agreement, Aspen-Tech suffered no damage.
*466 1. Section 2.7.2 Applying Only to RTO
AMT suggests that section 2.7.2, when read in its entirety, applies only to AspenTech’s RTO software. Because AspenTech’s remaining claim concerns the alleged interconnection of APC software, AMT continues, AspenTech cannot prevail because they have not alleged that any RTO software was interconnected. AMTs argument is unavailing. Examining the entire writing and giving the words their plain meaning, as we must, this court concludes that section 2.7.2 applies to all Aspen-Tech software and not just RTO software. The language of section 2.7.2 does not explicitly limit the restrictions set forth in that provision to RTO software. Rather, AMT agrees not to, in broad fashion:
. . . directly or indirectly interface, integrate, or interconnect AspenTech software to or with other software products that compete with AspenTech. Notwithstanding any other provision in this Agreement, AspenTech grants [AMT] the right to interface the Aspen Plus Optimization technology to competitors’ multivariable control technologies as part of client service projects.
If at any time during the term of this Agreement, AspenTech no longer offers a fully supported, commercial, open-equation modeling and optimization system (such as Aspen Plus version 11), the restriction outlined in this section 2.7.2 will be removed.
While this provision protects AspenTech’s RTO software and maximizes its use by allowing AMT to interface it with non-AspenTech software, its scope is not specifically limited to RTO software. Indeed, the provision simply refers to “AspenTech Software,” which, according to Exhibit A of the SI Agreement, encompasses a wide array of software products offered by AspenTech. The plain wording of the provision leads this court to hold that the provision was intended to proscribe any interface, integration, or interconnection between AspenTech’s and a competitor’s software, with the exception carved out in section 2.7.2 for AspenTech RTO software. See, e.g., Vincent, 109 S.W.3d at 867 (holding that court should apply plain meaning of the contract and enforce it as written). Accordingly, this court holds that section 2.7.2 applies to all AspenTech software.
2. Axens Prime G+ as Competitive Software
AMT next argues that Axens Prime G+ is not software that competes with any AspenTech software. Whether Axens Prime G+ is software that competes with AspenTech software is a question of fact for the fact finder. Before getting to the question of whether a factual issue exists with regard to whether the software was competitive, however, this court must first examine the scope of the SI Agreement to determine what exactly is considered software that “competes.”
Per the SI Agreement, AspenTech provided AMT with a number of no-cost licenses to use their software for APC and other process control services. Within this agreement were a number of restrictions, one being upon AMTs use of the software. Also contained in the agreement was a non-exhaustive list of AspenTech software covered by the agreement. Based on the nature of the agreement (no-cost license), its restrictive provisions, and list of software programs covered by the agreement, this court concludes that the agreement was intended to allow AMT to exclusively utilize AspenTech’s catalogue of software in carrying out all facets of process modeling, APC included. In short, if AspenTech produced a certain type of process modeling software, under the SI Agreement, AMT was obligated to use it.
AMT argues that the only AspenTech product that competes with Axens’s Prime G+ software was “hydro-treater,” and that because AspenTech never utilized “hydrotreater” for actual hydrotreater refining, there was no competition. This argument, however, misses the point of the SI Agreement. As discussed above, the purpose of the SI Agreement, and of section 2.7.2, was for AMT to utilize AspenTech’s whole catalogue of software for APC services.
The record shows that the Axens Prime G+ software was going to be, and may in fact have been, utilized by AMT for APC on Total’s hydrotreater unit. AMTs bid proposal for the Total service contract indicated that it was partnering with Axens to perform APC services for Total at its Port Arthur Plant. Furthermore, Mr. Finlayson testified that the Axens program would provide inferential modules relating to the unit which would then be used in the APC process.
The record also shows that AspenTech developed software for APC, including software that provided inferential calculations. Douglas Raven, Vice President of global professional services at AspenTech, testified that AspenTech’s “hydrotreater” and “Aspen IQ” were both software programs that created inferential calculations used in the APC process. Based on this evidence, a fact finder could reasonably find that AspenTech had software that would calculate inferen-tials that would then be used in the APC process. A fact finder could also find that Axens Prime G+ was software that produced inferentials which would be used in the APC process, and thus, that AspenTech’s and Axens’ inferential software were competitive. ■
AMT also argues that Axens’s software was never utilized with AspenTech’s software, and thus, that they did not breach the SI Agreement. Specifically, AMT argues “AspenTech is wholly unable to show that AMT interconnected any software that competes with any AspenTech software whatsoever.” In support of their argument, they cite the deposition testimony of Mark Spencer, a process control engineer at Total, in which he states that the Axens software was not currently being utilized at the Port Arthur plant and that he did not believe that it was ever utilized.
There is evidence in the record, however, that indicates that the Axens software was indeed interconnected to AspenTech’s software, thereby creating a factual issue *467 as to whether the contract was breached. Mr. Raven testified that he was under the impression that Axens, at least at the beginning of the project, interconnected its software to AspenTech’s DMCPlus software. Furthermore, Mr. Finlayson indicated that he thought that Axens’s Prime G+ had been used to gather data and output results from the hydrotreater unit. Conflicting testimony, such as that present here, with regard to issues of material fact, are particularly the province of the fact finder. See Golden Eagle Archery, Inc. v. Jackson, 116 S.W.3d 757, 761 (Tex. 2003) (holding trier of fact is sole judge of the credibility of witnesses and of the weight to be given to their testimony). Thus, viewing these facts in the light most favorable to the non-moving party, there exists a genuine issue of material fact as to whether AMT breached the SI Agreement.
C. Damages
AMT also argues that even if AspenTech can show a breach of the SI Agreement, their breach of contract claim must fail because they cannot show that they were damaged as a result. Under Texas law, a party may recover actual damages, that is, those that are the natural, probable, and foreseeable consequences of the breach. See Paragon General Contractors, Inc. v. Largo Construction, Inc., 227 S.W.3d 876, 885-86 (Tex.App. 2007). Even if a party cannot prove the actual amount of damages, they may be entitled to nominal damages if they can prove that there was a breach of contract. See Fisher v. Westinghouse Credit Corp., 760 S.W.2d 802, 808 (Tex.App. 1988). Generally, the amount of damages owed a party who has been injured as a result of a breach of contract is a question of fact for the fact finder. See Nautilus Training Center No. 2, Inc. v. Seafirst Leasing Corporation, 647 S.W.2d 344, 347 (Tex.App. 1982).
In this case, and notwithstanding AMTs arguments to the contrary, there is a question of fact regarding damages that should be left to the fact finder. As discussed above, there is a genuine issue of material fact as to whether AMT breached the SI Agreement. Should a fact finder find that AMT breached the SI Agreement, it will be their duty to determine the amount of damages, even those that are nominal, as a remedy for the breach. Accordingly, at this stage in the proceedings, there remains a genuine issue of material fact as to the amount of damages, if any, to which AspenTech is entitled. See Fisher, 760 S.W.2d at 808 (denying summary judgment where, “if there was a breach of contract, Fisher is at least entitled to nominal damages”).
Accordingly, so much of AMTs motion for summary judgment that relates to the actual interconnection between AspenTech’s and AMT’s software is hereby DENIED.
II. Implied Covenant of Good Faith and Fair Dealing
AspenTech alleges that AMT owed them a duty of good faith and fair dealing under the SI Agreement, and that by interfacing, integrating, and/or interconnecting competitive software, they breached that duty. Texas law does not recognize that a duty of good faith and fair dealing is implied in every contractual relationship. See, e.g., Barrand, Inc. v. Whataburger, Inc., 214 S.W.3d 122, 139 (Tex.App. 2006). Such a duty is implied only when a “special relationship” exists between the contracting parties. Texas courts have recognized that a special relationship, in the context of a contractual relationship, may arise where there is unequal bargaining power between the parties and a risk exists that one party may unfairly take advantage of that disparate bargaining power. Laredo Medical Group v. Lighnter, 153 S.W.3d 70, 72-73 (Tex.App. 2004), citing Arnold v. National County Mutual Fire Insurance Co., 725 S.W.2d 165, 167 (Tex. 1987).
Here, the record does not contain any evidence indicating that there was unequal bargaining power between the parties such to imply a “special relationship.” Aspen-Tech was represented by its own in-house counsel. Mr. Finlayson, who testified that in his previous employment “(w]e did all our own agreements . . .” negotiated on behalf of AMT. The parties to the SI Agreement are both sophisticated businesses intimately familiar with the services and software provided for in the contract. Furthermore, the evidence suggests that the negotiations were active, with both parties providing a number of edits and suggestions. Based on this record evidence, the court finds that the parties were on equal footing during the SI Agreement negotiations, and thus, the parties did not stand in a special relationship. See Anglo-Dutch Petroleum International, Inc. v. Smith, No. 14-06-00580-CV, 2007 WL 4165346, at *3 (Tex.App. Nov. 20, 2007) (trust and confidence must exist prior to, and apart, from agreement as basis of suit to impose special relationship) . For these reasons, AMTs motion as to AspenTech’s claim for breach of implied duty of good faith and fair dealing is hereby ALLOWED.
III. AspenTech’s G.L.c. 93A Claim
AspenTech argues that AMT engaged in unfair and deceptive acts or practices in violation of G.L.c. 93A, §§2 and 11. G.L. 93A, §11 provides:
. . . [A]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice declared unlawful by section two or by any rule or regulation issued under paragraph (c) of section two may, as hereinafter provided, bring an action in the superior court. . .
[N]o action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth. For purposes of this paragraph, the burden of proof *468 shall be upon the person claiming that such transactions and actions did not occur primarily and substantially within the commonwealth.
In determining whether the acts giving rise to the G.L.c. 93A claim “occurred primarily and substantially within the commonwealth,” this court will not base its decision on any test identified by any particular factor or factors. Kuwaiti Danish Computer Co. v. Digital Equipment Corporation, 438 Mass. 459, 473 (2003). Rather, taking all the facts in context with the circumstances giving rise to the claim, the court is simply called upon to determine “whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth.” Id.
Here, for the reasons set forth above in the choice of law discussion, this court finds that AMT has sufficiently shown that the actions giving rise to AspenTech’s G.L.c. 93A claim occurred solely in Texas and not Massachusetts. Because the gravity of the circumstances did not occur primarily and substantially within the Commonwealth, AspenTech’s 93A claim must fail as a matter of law. See Sonesta International Hotels Corp. v. Central Florida Investments, Inc., 47 Mass.App.Ct. 154, 157-60 (no error where Superior Court found that defendant had carried burden of showing that locus of activity for G.L.c. 93A, § 11 purposes took place in Florida and not Massachusetts). Accordingly, AMTs motion as to AspenTech’s G.L.c. 93A claim is hereby ALLOWED.
IV. AspenTech’s Claim of Intentional Interference with Prospective Business Relations
AspenTech also argues that AMT intentionally interfered with its prospective business relations with Total when they offered services that were in violation of the SI Agreement. In Texas, a party claiming tortious interference with prospective business or contract relations must establish: (1) a reasonable probability that the plaintiff would have entered a contractual relationship with a third party; (2) an intentional and malicious act that intervened with the formation of that relationship; (3) that the defendants lacked privilege or justification to interfere; and (4) that actual damage, loss, or harm resulted from the defendant’s interference. Allied Capital Corp. v. Cravens, 67 S.W.3d 486, 490 (Tex.App. 2002).
In this case, AMT has established, and AspenTech has failed to rebut, that there was no reasonable probability that AspenTech and Total would have entered into a contract. Under the first element of the test, “(w]hile it is not necessary to prove that the contract would have certainly been made but for the interference, it must be reasonably probable, considering all the facts and circumstances attendant to the transaction.” Milam v. National Insurance Crime Bureau, 989 S.W.2d 126, 131 (Tex.App. 1999).
Here, the record establishes that it was unlikely that Total would have awarded the services contract to AspenTech. AspenTech’s bid for the services contract was $499,510 while AMTs bid was $317,355. Randy Conley, a Project Manager at Total, indicated that there were no circumstances that would justify Total in awarding a contract to a high bidder where the bid differential was so large. Mr. Conley also testified that even if the bids were comparable, Total still would have awarded the contract to AMT because Total had been impressed with AMTs work. Thus, considering all of the facts and circumstances involved in the transaction, the court concludes that there was not a reasonable probability that AspenTech would have been awarded the services contract. See Milam, 989 S.W.2d at 132 (plaintiff failed to show that it was reasonably probable that he would have entered into contractual relationships). Accordingly, AMT’s motion as to AspenTech’s claim of intentional interference with prospective business relations is hereby ALLOWED.
ASPENTECH’S MOTION FOR PARTIAL SUMMARY JUDGMENT
AspenTech argues that the undisputed record evidence shows that AMT breached the SI Agreement, thus entitling them to summary judgment on their breach of contract claim. This court finds, however, that the record evidence, viewed in the light most favorable to AMT, exhibits factual issues as to whether AMT breached the SI Agreement that should be determined by a fact finder. Thus, for the reasons set forth above, AspenTech’s Motion for Summary Judgment is hereby DENIED.
ORDER
For the foregoing reasons, it is hereby ORDERED that AMTs Motion for Summary Judgment is ALLOWED in part and DENIED in part as to count I, and ALLOWED as to counts II, III, and IV. It is further ORDERED that AspenTech’s Motion for Partial Summary Judgment is DENIED.

 Formally ATOFINA.

Under the Restatement (Second) of Conflict of Laws (1971), §§186 and 187 provide that, in the absence of a choice of law by the parties, their rights are “determined by the local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties under the principles stated in §6.” Bushkin, 393 Mass. at 632. Under §6, relevant factors to the choice of the applicable law include: “(a) the needs of the interstate and international systems, (b) the relevant policies of the fomm, (c) the relevant policies of other interested states and relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.” Restatement (Second) of Conflict of Laws, §6(2). Furthermore, “the contacts to be taken into account in applying the principles of §6 to determine the law applicable to an issue include: (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of the performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties.” Id. at §188(2).