Affirmed in Part as Modified, Reversed and Remanded in Part, and Opinion
filed October 28, 2010.

 

 

In The

 

Fourteenth Court of
Appeals

___________________

 

NO. 14-09-00118-CV

___________________

 

Wolf Hollow I, L.P., Appellant

 

V.

 

El Paso Marketing, L.P. and

Enterprise Texas Pipeline, LLC,
Appellees



 



 

On
Appeal from the 165th District Court

Harris County,
Texas



Trial Court Cause No. 2006-70615

 



 

 

OPINION

            Wolf
Hollow I, L.P. (“Wolf Hollow”) appeals from a final judgment entered by the
trial court following its grant of several motions for summary judgment filed
by appellees, El Paso Marketing, L.P. (“El Paso”) and Enterprise Texas
Pipeline, LLC (“Enterprise”).  The disputes between the parties all revolve
around natural gas supply and transportation contracts.  We modify and, as
modified, affirm the portion of the judgment favoring El Paso and reverse and
remand the portion favoring Enterprise.

I.  Background

Wolf Hollow owns and
operates a natural gas fired power plant in Granbury, Texas.  To ensure a
supply of natural gas to the Granbury plant, Wolf Hollow’s predecessor-in-interest
entered into a Gas Supply and Fuel Management Agreement (the “Supply
Agreement”) with El Paso’s predecessor-in-interest on March 8, 2001.[1]  In December 2005,
Wolf Hollow and El Paso executed the First Amendment to Gas Supply and Fuel
Management Agreement, which modified certain sections of the Supply Agreement. 
Some of the more relevant provisions of these agreements are presented below.

The Supply Agreement addresses
the quality of the gas to be supplied in section 14.1, which reads in relevant
part as follows:

            Section 14.1 Quality.  The quality of
Quantity of Gas that [El Paso] sells, delivers or causes to be delivered to [Wolf
Hollow] or for [Wolf Hollow’s] account at the Point of Delivery shall meet or
exceed the minimum gas quality specifications established in the [Enterprise] Transporter’s
Tariff; provided, however, that (i) if [Enterprise] fails to
deliver Gas at the [Enterprise] Point of Delivery that meets such quality
specifications, then [El Paso] shall assign to [Wolf Hollow], or otherwise
cause [Wolf Hollow] to be subrogated to, any claim that [El Paso] may have
against [Enterprise] as a result of such delivery failure under the Gas
Transportation Agreements to which [Enterprise] is a party, as assigned by [Wolf
Hollow] to [El Paso] . . . .

Article XXI of the
Supply Agreement is entitled “Default and Remedies.”  Section 21.1 provides:

           Delivery Failure.  (a) Unless excused by
an Event of Force Majeure or by any other provision of this Agreement, if at
any time [El Paso] determines that it will not be able to sell, deliver or
cause to be delivered, or actually fails to sell, deliver or cause to be
delivered, to [Wolf Hollow] or for the account of [Wolf Hollow] at the relevant
Point of Delivery a Quantity of Gas in an amount equal to the Scheduled
Delivery Quantity, [El Paso] shall immediately notify [Wolf Hollow] of [El
Paso’s] inability to fully perform its obligations under this Agreement and [Wolf
Hollow] may seek to cover any failure or anticipated inability of [El Paso] to
deliver the Scheduled Delivery Quantity by making such Gas purchases from other
suppliers using the Cover Standard, and upon making such purchases shall be
entitled to recover from [El Paso] the product of (i) the positive difference,
if any, between the price of such replacement Gas and the price applicable to
the Gas [El Paso] actually failed to deliver on such Day, and (ii) the amount
by which the Scheduled Delivery Quantity for such Day exceeds the actual
Quantity of Gas delivered to the relevant Point of Delivery by [El Paso] (“[El
Paso’s] Deficiency Quantity”). . . .

            (b)       If [Wolf Hollow] has used the Cover
Standard in an effort to purchase [El Paso’s] Deficiency Quantity from a third
party Gas supplier and no such purchase, or portion thereof, is available, [El
Paso] may provide replacement power at a location where [Wolf Hollow] would
have otherwise delivered the capacity or energy that [Wolf Hollow] would have
produced and delivered but for [El Paso’s] Gas delivery failure in accordance
with the following: [El Paso] shall notify [Wolf Hollow] whether it elects to
provide replacement power no later than one (1) hour before the deadline for [Wolf
Hollow] to indicate whether it will provide Replacement Power to Peco Energy
under the Power Contract or to such other offtaker with whom [Wolf Hollow] has an
effective power contract and to whom [Wolf Hollow] may contractually deliver
Replacement Power (an “Alternative Offtaker”), as the case may be, and if so,
[El Paso’s] supply source, delivery point, and transmission arrangement.  [Wolf
Hollow] shall accept or reject, at its sole discretion, the proposed
replacement power . . . .

            (c)       If [El Paso] is unable to provide
replacement power or [Wolf Hollow] rejects [El Paso’s] offer to provide
replacement power, [Wolf Hollow] shall be entitled to recover from [El Paso]
the sum of (i) the positive difference if, any, between the cost incurred by [Wolf
Hollow] to purchase (utilizing the Cover Standard) energy or capacity to
replace the energy or capacity [Wolf Hollow] could not produce at [Wolf Hollow’s]
Facility due to [El Paso’s] Gas delivery failure and [Wolf Hollow’s] avoided
costs in purchasing such replacement energy or capacity and not producing the
same at [Wolf Hollow’s] Facility, (ii) any monthly reduction or complete loss
of capacity payments under any power sales contract, including the Power
Contract, then in effect to which [Wolf Hollow] is a party and invoiced from [Wolf
Hollow] to [El Paso] monthly, and (iii) lost variable payments under any power
sales contract, including the Power Contract, then in effect to which [Wolf
Hollow] is a party to the extent those variable payments exceed $0.70MWh. . . .

            (d)       [El Paso] shall pay to [Wolf Hollow]
amounts due under this Section 21.1 within ten (10) Days following [El Paso’s]
receipt from [Wolf Hollow] of an invoice setting forth the amounts owed. . . .

Section 21.2 of the
Supply Agreement provides, in pertinent part:

Event of Default.  (a) An Event of Default under
this Agreement shall be deemed to exist upon the occurrence of any one or more
of the following events, unless excused by an Event of Force Majeure: . . .

(ii)       failure by [El Paso] to deliver or cause to be
delivered at the relevant Point of Delivery a Quantity of Gas that, in the
aggregate, equals or exceeds 1.8 Bcf of all or any portion of the Scheduled
Delivery Quantities that [Wolf Hollow] requests [El Paso] to deliver over the
course of any Contract Year; or . . .

(v)       failure by either Party to perform fully any
other material provision of this Agreement and (A) such failure continues for a
period of sixty (60) Days after written notice of such non-performance is
received by the non-performing party . . .

Section 1.9 of the First
Amendment modified the language found in Section 21.3 of the Supply Agreement. 
As amended, section 21.3 reads as follows:

Remedies for Event of Default.  During any Event of
Default, the party not in default shall have the right:

(a)       To
immediately suspend its performance under this Agreement, subject to the terms
and conditions herein;

(b)       To
terminate this Agreement upon ten (10) Days written notice to the defaulting
party and seek damages for the harm caused by the Event of Default;

(c)       to
pursue any other remedy provided under this Agreement, or now or hereafter
existing at law or in equity or otherwise, including but not limited to:

(A)      any rights and remedies
available to a secured party, if any, under Article 9 of the Uniform Commercial
Code of the jurisdiction in which the Performance Assurance is being held and
any other applicable jurisdiction and any other applicable laws with respect to
the Performance Assurance held by or for the benefit of seller;

(B)      any right to set off any
Performance Assurance held by it or for its benefit of against and in
satisfaction of any amount payable by the other party under this Agreement; or

(C)      any right to draw on any
outstanding Letter of Credit issued for its benefit and apply proceeds
therefrom, in addition to any Cash held by such party, against amounts payable
by the other party under this Agreement.  

           Finally,
in the Supply Agreement, Wolf Hollow and El Paso agreed to limit their
liability:

            Section 24.11 Limitation of Liability; [El
Paso] Liability Cap.  (a) EXCEPT AS SPECIFICALLY SET FORTH HEREIN, NEITHER
PARTY SHALL BE LIABLE TO THE OTHER PARTY FOR INCIDENTAL, SPECIAL, INDIRECT,
PUNITIVE OR CONSEQUENTIAL DAMAGES.

             In
addition, Wolf Hollow’s predecessor-in-interest entered into a Transportation
Agreement with Enterprise’s predecessor-in-interest (EPGT Texas Pipeline, L.P.). 
Under the terms of the Transportation Agreement, Enterprise agreed to provide
natural gas pipeline transportation service to Wolf Hollow’s Granbury plant.  Because
the Transportation Agreement incorporates Enterprise’s publicly filed tariff,
it effectively contains two assignment clauses.  The first states:

ASSIGNMENT: NOTWITHSTANDING ANYTHING HEREIN TO THE
CONTRARY, SHIPPER [WOLF HOLLOW] MAY ASSIGN ITS RIGHTS AND OBLIGATIONS UNDER
THIS AGREEMENT TO ANY PARTY THAT PROVIDES FUEL MANAGEMENT SERVICES TO SHIPPER
OR AGREES TO SELL AND DELIVER GAS TO SHIPPER AT SHIPPER’S PLANT, UPON THE
CONSENT OF TRANSPORTER [ENTERPRISE], WHICH CONSENT SHALL NOT BE UNREASONABLY
WITHHELD.  THE PARTIES AGREE THAT IT SHALL BE UNREASONABLE FOR TRANSPORTER TO
WITHHOLD ITS CONSENT TO SUCH AN ASSIGNMENT IF (A) SHIPPER’S ASSIGNEE’S
CREDITWORTHINESS MEETS OR EXCEEDS TRANSPORTER’S CREDIT REQUIREMENTS, (B)
SHIPPER’S ASSIGNEE TAKES ASSIGNMENT OF THE WHOLE AGREEMENT, AND (C) SUCH
ASSIGNMENT IS FOR A TERM OF AT LEAST ONE (1) YEAR.

The
second, found in the publicly filed tariff, provides in relevant part as
follows:

22.       ASSIGNMENT

            The service agreement between Shipper and
Transporter, including, without limitation, each indemnification, shall inure
to and bind the permitted successors and assigns of Shipper and Transporter,
provided neither Shipper nor Transporter shall transfer the service agreement
without the prior written approval of the other and which approval may not be
unreasonably withheld, delayed or conditioned.  Such transfer shall not be
effective until approved by the other party.  Provided further, either Shipper
or Transporter may transfer its interest to any parent or affiliate by
assignment, merger or otherwise without the prior approval of the other, but no
such transfer shall operate to relieve the transferor of its obligations
hereunder. . . .

Wolf
Hollow assigned the Transportation Agreement to El Paso. 

            In
2006 and early 2007, there were four brief interruptions in the delivery of
natural gas to Wolf Hollow’s power plant.  The first occurred on August 9, 2006
due to an equipment failure on the Enterprise pipeline.  The second occurred on
September 11, 2006 when an Enterprise technician made a computer error which
caused the line pressure to increase, in turn causing a gas flow shut-in at the
Granbury power plant.  The third incident, on January 8, 2007, again involved an
equipment failure on the Enterprise pipeline.  The fourth and final
interruption occurred three days later, on January 11, 2007, and also was due
to a pipeline equipment failure.

            El
Paso gave notice of these four interruptions as events of force majeure under
the Supply Agreement; however, Wolf Hollow declined to agree that the
interruptions were in fact excused under the contract.[2]  In addition to
the four interruptions, a dispute arose between Wolf Hollow and El Paso over
the quality of the natural gas delivered to and accepted by Wolf Hollow. 
Specifically, Wolf Hollow alleges that the gas was contaminated by heavy liquid
hydrocarbons, requiring periodic plant shutdowns.

Faced with these
disputes, El Paso sought a declaratory judgment that it had properly invoked
the force majeure provisions and that it was not liable for Wolf Hollow’s
claims related to the quality of the gas delivered to the Granbury plant.  Wolf
Hollow filed a counterclaim against El Paso seeking damages for breach of
contract, breach of warranties, and negligence.[3] 
Specifically, Wolf Hollow sought recovery for the following:  (1) charges
incurred for purchasing replacement power to meet its output commitments; (2) physical
damage to the Granbury power plant; (3) the cost of procuring additional fuel
treatment equipment; and (4) the costs for cleaning, replacing, and refurbishing
various turbine parts.  All of Wolf Hollow’s alleged damages arose out of
either the four gas delivery interruptions or the alleged delivery of contaminated
natural gas.

El Paso also filed a
third-party petition against Enterprise, seeking to recover contribution and
indemnity for any liability that El Paso might have to Wolf Hollow.  Wolf
Hollow then filed a negligence cross-claim against Enterprise.  According to Wolf
Hollow, Enterprise was negligent when it (1) delivered gas that failed to
comply with the quality specifications contained in the Transportation
Agreement, and (2) permitted the four interruptions in gas delivery.  From
Enterprise, Wolf Hollow sought to recover:  (1) the cost of replacement power,
(2) amounts for damage to the Granbury plant, (3) sums expended in mitigation of
damages, (4) the cost to purchase additional fuel treatment equipment, and (5)
the costs of cleaning and refurbishing turbines at the Granbury facility.

All issues in the
litigation were resolved by the trial court’s rulings on a series of summary
judgment motions filed by El Paso and Enterprise.  In its rulings, the trial
court disposed of Wolf Hollow’s claims against El Paso on multiple grounds, all
based on interpretations of language found in the Supply Agreement and the First
Amendment thereto.  Among its rulings, the trial court concluded that:  (1) the
four delivery interruptions were caused by events of force majeure which
excused El Paso’s performance; (2) all damages sought by Wolf Hollow were
consequential damages barred by section 24.11 of the Supply Agreement; and (3)
section 14.1 of the Supply Agreement created an exclusive remedy for Wolf
Hollow’s gas quality claims: an assignment by El Paso of any quality claims it
might have against Enterprise.  Also, without specifying the grounds, the trial
court granted Enterprise’s motion for summary judgment on Wolf Hollow’s
negligence claim.  Following the issuance of its summary judgment orders, the
trial court entered a final judgment ordering that Wolf Hollow take nothing on
its claims against El Paso and Enterprise.  The final judgment also granted a
declaratory judgment favoring El Paso, declaring that (1) the four service
interruptions constituted events of force majeure; (2) Wolf Hollow’s exclusive
remedy for its gas quality claims was an assignment of El Paso’s claims against
Enterprise; and (3) Article XXI (“Default and Remedies”) of the Supply
Agreement does not apply to Wolf Hollow’s gas quality claims.

In nine issues on
appeal, Wolf Hollow challenges the trial court’s granting of El Paso’s and
Enterprise’s motions for summary judgment.  Eight of Wolf Hollow’s issues
address El Paso’s motions for summary judgment.  Wolf Hollow’s ninth issue
addresses summary judgment on its negligence cause of action against
Enterprise.

II.  Standards of Review

            A
movant for summary judgment has the burden of showing that there is no genuine
issue of material fact, and thus, it is entitled to judgment as a matter of
law.  Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 548 (Tex. 1985).  If
there is no genuine issue of material fact, summary judgment should be entered
as a matter of law.  Haase v. Glazner, 62 S.W.3d 795, 797 (Tex. 2001). 
We review a trial court’s summary judgment de novo.  Valence Operating Co.
v. Dorsett, 164 S.W.3d 656, 661 (Tex. 2005).

            Because
there are no disputed facts, this case presents only a matter of determining
the legal effect of the language found in the Supply Agreement and the First
Amendment thereto.[4] 
In construing a written contract, the primary concern of the court is to
ascertain the true intentions of the parties as expressed in the instrument.  Id.
at 662.  Ordinarily, the writing alone is sufficient to express the parties’
intentions for it is the objective, not subjective, intent that controls.  Matagorda
Hosp. Dist. v. Burwell, 189 S.W.3d 738, 740 (Tex. 2006) (per curiam).  To determine
intent, we examine and consider the entire writing in an effort to harmonize
and give effect to all provisions of the contract so that none will be rendered
meaningless.  Valence Operating Co., 164 S.W.3d at 662.  No single
provision controls; rather, all the provisions must be considered with
reference to the entire instrument.  Myers v. Gulf Coast Minerals Mgmt.
Corp., 361 S.W.2d 193, 196 (Tex. 1962).  We presume that every clause in
the contract was intended by the parties to the contract to have some effect.  Fein
v. R.P.H., Inc., 68 S.W.3d 260, 266 (Tex. App.—Houston [14th Dist.] 2002,
pet. denied) (citing Heritage Res., Inc. v. NationsBank, 939 S.W.2d 118,
121 (Tex. 1996)).  We construe contracts from a utilitarian standpoint, bearing
in mind the particular business activity sought to be served, and will avoid
when possible and proper, a construction which is unreasonable, inequitable, or
oppressive.  Frost Nat’l Bank v. L & F Distribs., Ltd., 165 S.W.3d
310, 312 (Tex. 2005).  Courts, however, are not authorized to rewrite
agreements by inserting additional terms, definitions, or provisions that the
parties could have included themselves but did not, or by implying terms for
which the parties have not bargained.  Tenneco, Inc. v. Enter. Prods. Co.,
925 S.W.2d 640, 646 (Tex. 1996).  In other words, courts cannot make contracts
for the parties.  HECI Exploration Co. v. Neel, 982 S.W.2d 881, 888
(Tex. 1998).

III.  Summary Judgment for El Paso

Wolf
Hollow essentially makes two types of claims against El Paso:  those pertaining
to the four delivery interruptions and those pertaining to alleged damages
resulting from the delivery of contaminated gas.  In one of its motions for
summary judgment, El Paso contended that all of Wolf Hollow’s claims sought
consequential damages which were expressly waived under section 24.11 of the
Supply Agreement.  The trial court granted this motion, effectively defeating
all of Wolf Hollow’s claims.  In its seventh appellate issue, Wolf Hollow
contends that the trial court erred in characterizing its damages as
“incidental, special, indirect, or consequential” and in holding that such
damages were waived under section 24.11.  We will begin by addressing whether
Wolf Hollow’s claims pertaining to the four service interruptions sought
consequential damages and whether its gas quality claims sought consequential
damages.  We will then consider Wolf Hollow’s eighth issue in which it
contended that the trial court erred in finding that Wolf Hollow had sustained no
direct damages on claims the trial court had already disposed of on other
summary judgment grounds.[5]

A.  Consequential Damages for Service Interruptions

In its Amended
Counterclaim, Wolf Hollow alleged that due to the four service interruptions,
it was forced to purchase replacement power in order to fulfill its dispatch
commitments.  El Paso asserted in one of its motions for summary judgment that
the purchase of replacement power was a consequential damage barred by section
24.11(a) of the Supply Agreement.  That section reads as follows:  “EXCEPT AS
SPECIFICALLY SET FORTH HEREIN, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY
FOR INCIDENTAL, SPECIAL, INDIRECT, PUNITIVE OR CONSEQUENTIAL DAMAGES.”  The
trial court granted this motion for summary judgment.

On appeal, Wolf Hollow
contends that the cost of replacement power occasioned by the four service
interruptions constituted direct damages and that the trial court therefore erred
in characterizing such costs as consequential damages.  In support of this
contention, Wolf Hollow cites to common law distinctions between “direct
damages” and “consequential damages.”  See, e.g., Tenn. Gas Pipeline Co. v.
Technip USA Corp., 2008 WL 3876141, at *7-11 (Tex. App.—Houston [1st Dist.]
August 21, 2008, pet. denied).  Although the Supply Agreement contains elements
of both the sale of goods and the provision of services, the sale of goods is
the dominant theme of the Agreement.  Consequently, article 2 of the Uniform
Commercial Code (“UCC”) applies and common law principles do not apply to the
extent they conflict with provisions of the UCC.  See Tex. Bus. &
Comm. Code § 2.102; Graybar Elec. Co. v. LEM & Assocs., L.L.C., 252
S.W.3d 536, 542 (Tex. App.—Houston [14th Dist.] 2008, no pet.); see also
El Paso Natural Gas Co. v. Minco Oil & Gas, Inc., 8 S.W.3d 309, 313
(Tex. 1999) (holding that contract for buying and selling oil and gas was a
transaction involving “goods” and thus governed by the UCC); Natural Gas
Clearinghouse v. Midgard Energy Co., 113 S.W.3d 400, 408 n.3 (Tex.
App.—Amarillo 2003, pet. denied) (following Minco).  The Texas common
law and the UCC do not utilize the same definitions of direct and consequential
damages.  See Wade & Sons, Inc. v. Am. Standard., Inc., 127 S.W.3d
814, 823-24 (Tex. App.—San Antonio 2003, pet. denied).[6]

Under UCC section 2.713,
the measure of a buyer’s damages for non-delivery of a product is calculated by
the difference between the market price for the same type of product at the
time when the buyer learned of the breach and the contract price, together with
any incidental and consequential damages provided in chapter 2.  Tex. Bus.
& Comm. Code § 2.713 & cmt. 2.  The product at issue here was natural
gas; thus, the cost for replacement power would not be an appropriate measure
of direct damages under the section.  Wolf Hollow’s argument to the contrary is
without merit.

UCC section 2.715
defines consequential damages as “(1) any loss resulting from general or
particular requirements and needs of which the seller at the time of
contracting had reason to know and which could not reasonably be prevented by
cover or otherwise;  and (2) injury to person or property proximately resulting
from any breach of warranty.”  Id. § 2.715.  Although Wolf Hollow has
alleged that the cost of replacement power resulted from requirements
(specifically Wolf Hollow’s energy dispatch obligations to its customers) that
El Paso knew about, section 24.11(a) of the Agreement expressly excludes
recovery of consequential damages.  UCC section 2.719 permits parties to modify
available remedies and specifically permits consequential damages to be limited
or excluded so long as such limitation or exclusion is not unconscionable.  Id.
§ 2.719.  Therefore, even if Wolf Hollow is correct about El Paso’s knowledge,
these damages are consequential damages, which are barred by the Supply
Agreement.

Wolf Hollow additionally
appears to argue that it was entitled to recover as damages its replacement
energy costs because such recovery was expressly contemplated by the Supply Agreement. 
Wolf Hollow first points out that section 24.11 of the agreement barred
consequential damages “except as specifically set forth” in the agreement. 
Wolf Hollow then insists that section 21.1(c) specifically authorizes its
recovery of replacement power costs.  This subsection indeed mentions the
possibility that Wolf Hollow could recover the cost to purchase replacement power;
however, it limits this possibility to certain specific circumstances.

Section 21.1, as a whole,
sets up a scheme accounting for the possibility that El Paso might fail to
deliver a scheduled quantity of gas.  Subsection 21.1(a) states that:

Unless excused by an Event of Force Majeure . . . , if at
any time [El Paso] determines that it will not be able to [deliver] a Quantity
of Gas in an amount equal to the Scheduled Delivery Quantity, [El Paso] shall
immediately notify [Wolf Hollow] and [Wolf Hollow] may seek to cover . . . by
making such Gas purchases from other suppliers using the Cover Standard, and .
. . recover from [El Paso] the . . . difference, if any, between the price of
such replacement Gas and the price applicable to the Gas that [El Paso]
actually failed or anticipates failing to deliver . . . .

Subsection 21.1(b) then
states that:

If [Wolf Hollow] has used the Cover Standard in an effort
to purchase [El Paso’s] Deficiency Quantity from a third-party Gas supplier and
no such purchase, or portion thereof, is available, [El Paso] may provide
replacement power at a location where [Wolf Hollow] would have otherwise
delivered the capacity . . . but for [El Paso’s] Gas delivery failure . . . .

This
subsection further provides that El Paso has to timely notify Wolf Hollow that
it elects to provide replacement power and that Wolf Hollow has discretion to
accept or reject the replacement power.

Subsection 21.1(c) then
provides that:

If [El Paso] is unable to provide replacement power or
[Wolf Hollow] rejects [El Paso’s] offer to provide replacement power, [Wolf
Hollow] shall be entitled to recover from [El Paso] the sum of [among other
things] the positive difference [if any] between the cost incurred by [Wolf
Hollow] to purchase . . . energy or capacity to replace the energy or capacity
[Wolf Hollow] could not produce at [its] Facility due to [El Paso’s] Gas
delivery failure and [Wolf Hollow’s] avoided costs in purchasing such
replacement energy or capacity and not producing the same at [its] Facility . .
. .

Wolf Hollow contends
that subsection (c) permits it to purchase, and be reimbursed for, replacement
power in the event of a service disruption without regard to whether the steps
set forth in subsections (a) and (b) have been undertaken.  However, read in
isolation, subsection 21.1(c) is meaningless.  It states that Wolf Hollow is
entitled to be reimbursed for replacement power if El Paso is unable to provide
such power or Wolf Hollow rejects such power, but it does not explain under
what circumstances El Paso would be offering replacement power.  In other
words, it merely states a remedy without stating the occurrence for which a
remedy is needed.  It is only by reference to the earlier portions of section
21.1 that subsection 21.1(c) makes sense.  When read in its entirety, section
21.1 makes it clear that the provisions of subsection (c) apply only when the
steps in subsections (a) and (b) have been followed.  More specifically, Wolf
Hollow can be reimbursed for replacement power only if:  (1) under subsection (a),
El Paso is unable to deliver a scheduled quantity of gas; (2) under subsection
(b), Wolf Hollow has been unsuccessful in attempting to cover by purchasing gas
from other suppliers; and (3) under subsection (c), El Paso was unable to
provide replacement power or Wolf Hollow rejected El Paso’s offer of
replacement power.  This reading of section 21.1 is reinforced by the fact that
both subsection (b) and (c) begin with “if-then” clauses that tie them to the
circumstances discussed in the immediately preceding subsection.  Wolf Hollow
does not contend that all of the predicates to its recovery of replacement
power costs under Section 21.1 occurred in this case.  In short, section 21.1
provides very specific remedies for very specific circumstances that Wolf
Hollow does not allege occurred in this case.  Wolf Hollow’s asserted damages
based on the four service interruptions are all consequential damages barred
under the Supply Agreement.

B.  Consequential Damages for Quality Issues

Wolf Hollow’s claims
based on the alleged delivery of contaminated natural gas sought recovery for
(1) physical damage to the Granbury power plant; (2) costs for cleaning,
replacing, and refurbishing various turbine parts; (3) charges incurred for
purchasing replacement power during shutdowns occasioned by the need for
cleaning, replacing, and refurbishing of parts; and (4) costs for procuring
additional fuel treatment equipment required due to the delivery of
contaminated gas.  As explained above, the trial court granted summary judgment
against these claims and damages based on the waiver of consequential damages
contained in section 24.11 of the Supply Agreement, and Wolf Hollow challenges
this holding in issue 7.

Wolf Hollow correctly
points out that under the UCC, a buyer’s damages for non-conforming goods, when
such goods are nonetheless accepted by the buyer, are governed by section
2.714, which reads in full as follows:

§ 2.714. Buyer’s Damages for Breach in Regard to
Accepted Goods

            (a) Where the buyer has accepted goods and
given notification (Subsection (c) of Section 2.607) he may recover as damages
for any non-conformity of tender the loss resulting in the ordinary course of
events from the seller's breach as determined in any manner which is reasonable.

            (b) The measure of damages for breach of
warranty is the difference at the time and place of acceptance between the
value of the goods accepted and the value they would have had if they had been
as warranted, unless special circumstances show proximate damages of a
different amount.

            (c) In a proper case any incidental and
consequential damages under the next section may also be recovered.

Tex.
Bus. & Comm. Code § 2.714.[7] 
As stated in the UCC section, the typical measure of damages in such situations
is “the difference . . . between the value of the goods accepted and the value
they would have had if they had been as warranted.”  Id. § 2.714(a).  In
this lawsuit, however, Wolf Hollow is not seeking damages by this measure. 
Instead, Wolf Hollow states that it is seeking damages based on the portion of
section 2.714(a) that provides the general measure applies “unless special
circumstances show proximate damages of a different amount.”  Id.  In
short, Wolf Hollow argues that the need to purchase replacement power was a
“special circumstance” or, at least, was due to “special circumstances.”  Wolf
Hollow, however, offers no analysis or citation supporting its assertion that
the purchase of replacement power constituted or was caused by a “special
circumstance.”  Although it might be possible to speculate regarding special
circumstances in this case, we decline to make Wolf Hollow’s argument or case
for it.

            Next,
Wolf Hollow argues that even if the cost of replacement power is deemed a
consequential damage, such costs are still recoverable under the Supply
Agreement.  More specifically, Wolf Hollow points out that section 24.11
provides that consequential damages are barred “[e]xcept as specifically set
forth herein.”  Further according to Wolf Hollow, section 21.3(c), as amended,
permits recovery of consequential damages wherein it states that:  “During any
Event of Default, the Party not in default shall have the right . . .  to
pursue any other remedy provided under this Agreement, or now or hereafter
existing at law or in equity or otherwise . . . .”  Wolf Hollow claims that the
gas contamination constituted an “Event of Default” under the Agreement.

Wolf Hollow’s
interpretation of these provisions, however, would effectively nullify the waiver
of consequential damages and, in so doing, violate a principle tenet of
contract construction:  specific provisions of a contract govern over general
ones.  See, e.g., Grynberg v. Grey Wolf Drilling Co., L.P., 296
S.W.3d 132, 137 & n.17 (Tex. App.—Houston [14th Dist.] 2009, pet. denied)
(citing Forbau v. Aetna Life Ins. Co., 876 S.W.2d 132, 133-34 (Tex.
1994)).  Section 24.11 waives consequential damages except as may be specifically
provided in other portions of the contract.  The language in section 21.3(c)
highlighted by Wolf Hollow states very generally that a nondefaulting party may
be entitled to any remedy under the agreement or otherwise existing at law or
in equity.  Therefore, the language in section 21.3(c) neither controls over
the more specific statement in section 24.11 nor does it fulfill the
requirement in section 24.11 that to be recoverable, consequential damages must
be “specifically set forth” in another part of the contract.  Wolf Hollow’s
reliance on this language is without merit.[8]

Lastly, Wolf Hollow
maintains that El Paso’s breach of the fuel management services provisions in
the Supply Agreement, specifically the requirement in subsection 5.4(b)(v) that
El Paso “use Prudent [Fuel Management] Practices to minimize any costs to” Wolf
Hollow, means that Wolf Hollow could recover any such costs, including what
might otherwise be considered consequential damages.[9]  However, we do
not read this reference to “any costs” so broadly.  If we did, it would render
the bar to consequential damages in section 24.11 meaningless.  See Valence
Operating Co., 164 S.W.3d at 662 (explaining that in interpreting a contract,
courts must consider the entire writing in an effort to harmonize and give
effect to all provisions so that none will be rendered meaningless). Wolf
Hollow suggests that any other interpretation than the one it offers would
effectively render section 5.4(b)(v) meaningless.  This is incorrect.  Although
not mentioned by Wolf Hollow, subsection 5.4(b)(v) actually provides a nonexclusive
list of the type of costs contemplated:  “hourly variance charges, daily
imbalance fees, and monthly cash-out charges
assessed by the relevant Transporter under its OBA or Transporter
Tariff, storage fees and short-term parking and lending fees.”  The kinds of
costs listed could be considered consequential damages specifically provided
for as contemplated in section 24.11.  However, the types of damages Wolf
Hollow claims in the present lawsuit—physical
damage to the plant; costs for cleaning, replacing, and refurbishing; charges
for replacement power; and costs for additional equipment—are fundamentally different from the types of costs
listed in subsection 5.4(b)(v).  As
stated, if the list in subsection 5.4(b)(v) is broad enough to include the damages
claimed here, then section 24.11 would be impermissibly rendered meaningless. 
Consequently, Wolf Hollow’s arguments based on subsection 5.4(b)(v) are without
merit.[10]

Wolf Hollow’s asserted
damages based on the delivery of contaminated natural gas are all consequential
damages barred by the Supply Agreement.  Based on the foregoing analysis, the
trial court did not err in granting summary judgment against Wolf Hollow’s
claims based on the four service interruptions or the delivery of contaminated
gas.  We overrule Wolf Hollow’s seventh issue.  Because the trial court’s
ruling on consequential damages defeated all of Wolf Hollow’s claims against El
Paso for damages, we need not address Wolf Hollow’s other appellate issues
seeking reversal of the trial court’s judgment for El Paso.[11]  Furthermore, our
holding on the consequential damages issue renders the trial court’s grant of
declaratory judgment favoring El Paso on other defensive issues moot.[12]  Accordingly, we
modify the trial court’s judgment to delete the declaratory judgment language.

C.  Summary Judgment on Direct Damages

            In
issue eight, Wolf Hollow suggests that the trial court’s holding that Wolf
Hollow take nothing on its claims for direct damages is a nullity because Wolf
Hollow did not request direct damages in its pleadings.  Based on our analysis
above, explaining that all of Wolf Hollow’s claims sought consequential and not
direct damages, we agree that the trial court’s holding regarding direct
damages was irrelevant to the outcome of this case.  The trial court’s final
judgment does not mention direct damages, and Wolf Hollow does not pray for
modification of the judgment on this basis; accordingly, we need make no such modification.

IV.  Summary Judgment for Enterprise

As stated above, Wolf
Hollow filed a cross-claim against Enterprise alleging that it negligently
delivered contaminated natural gas to the Granbury power plant.  Enterprise
moved for summary judgment on two grounds:  (1) Wolf Hollow is not entitled to
recover for negligence based on obligations in a contract to which it is not a
party; and (2) the economic loss rule precludes Wolf Hollow from recovering on its
negligence claim.  The trial court granted Enterprise’s motion without
specifying the grounds therefor.[13] 
In its ninth issue, Wolf Hollow challenges both grounds asserted by Enterprise.

A.  Negligence Based on Performance of Contract

            In
its appellate briefing, Enterprise contends that Wolf Hollow’s negligence cause
of action fails as a matter of law because every “purported ‘tort’ duty that [Wolf
Hollow] alleges arises only from the Transportation Agreement.”  Enterprise
then argues that “[i]t is well established in Texas that a plaintiff cannot
take a breach of contract action claim and convert it into a tort claim.” 
While we agree with Enterprise’s statement of the general rule, our analysis
does not end there.

            Wolf
Hollow and Enterprise agree that once Wolf Hollow assigned the Transportation
Agreement to El Paso, Wolf Hollow and Enterprise were no longer in contractual
privity.  Nonetheless, as Enterprise correctly points out, Wolf Hollow cannot
escape the limitations on liability found in the Transportation Agreement simply
by assigning the contract to a third party.  See Seagull Energy E & P,
Inc. v. Eland Energy, Inc., 207 S.W.3d 342, 346–47 (Tex. 2006).  However, a
party to a contract can escape liability under the contract if the terms of the
original contract expressly or impliedly release the assigning party.  Id.
at 347.  Therefore, the answer here “turns on whether the parties to the
[Transportation Agreement] expressly agreed upon the consequences that should
follow an assignment . . . to a third party.”  Id.

As quoted above, the
Transportation Agreement provides that Wolf Hollow could assign its rights and
obligations under the Transportation Agreement to any party providing fuel
management services to Wolf Hollow.  The summary judgment evidence establishes that
Wolf Hollow assigned the Transportation Agreement to El Paso, the third party
providing fuel management services to Wolf Hollow.  Furthermore, it is clear
from the language of assignment that the parties to the Transportation Agreement
expressly agreed on the consequences that would follow an assignment.  The
language of the assignment clause in Enterprise’s filed tariff specifically
provides that if Wolf Hollow assigns its interest in the Transportation
Agreement to a parent or affiliated company without Enterprise’s approval, the
assignment would not relieve Wolf Hollow of its contractual obligations.  By
expressly stating that Wolf Hollow would retain all contractual rights and
obligations only if it chose to make the specified type of assignment, the
parties expressed an intent that Wolf Hollow would not retain those contractual
rights and obligations for any other type of assignment.  Consequently, because
Wolf Hollow assigned all of its rights and obligations under the Transportation
Agreement to El Paso and not to a parent or affiliated company, it did not
retain any contractual rights, and therefore, its negligence cause of action is
not an improper attempt to convert a contract action into a tort.

We also disagree with
Enterprise’s argument that Wolf Hollow’s negligence cause of action must fail
because a contract created Enterprise’s duty to deliver natural gas to Wolf
Hollow’s power plant.  The fact that an act is induced by and done pursuant to
a contract does not shield it from regular tort liability.  Goose Creek
Consol. I.S.D. of Harris and Chambers Counties, Tex. v. Jarrar’s Plumbing, Inc.,
74 S.W.3d 486, 494 (Tex. App.—Texarkana 2002, pet. denied) (citing Thomson
v. Espey Huston & Assocs., 899 S.W.2d 415, 420 (Tex. App.—Austin 1995,
no writ)).  “One who undertakes to perform a contract assumes a duty to all
persons to take reasonable care not to injure them or their property in the
performance of that contract, and one who is not privy to the contract may
assert a claim for negligence for a breach of that duty.”  Id.  Here, Wolf
Hollow has alleged and produced summary judgment evidence that Enterprise’s
negligent performance of the Transportation Agreement physically damaged
components of its power plant.  The fact that Enterprise’s duty to deliver
natural gas to Wolf Hollow arose out of a contract (between El Paso and
Enterprise) does not prohibit Wolf Hollow’s negligence cause of action.

B.  Economic Loss Rule

In a related argument,
Enterprise contends that the economic loss rule prohibits Wolf Hollow’s
negligence cause of action.  We disagree.  The economic loss rule applies when
losses arise from the failure of a product, and the damage is limited to the
product itself.  Equistar Chems., L.P. v. Dresser-Rand Co., 240 S.W.3d
864, 867 (Tex. 2007).  The rule does not preclude tort recovery if a defective
product causes physical harm to the ultimate user or consumer, or other
property of the user or consumer, in addition to causing damage to the product
itself.  Id.  In Texas, the economic loss rule has been applied to
preclude tort claims in two related contexts:  (1) where the losses sought to
be recovered are the subject matter of a contract between the parties; and (2)
when the claims are for economic losses against the manufacturer or seller of a
defective product where the defect damaged only the product and did not cause
personal injury or damage to other property.  Coastal Conduit & Ditching,
29 S.W.3d 282, 285 (Tex. App.—Houston [14th Dist.] 2000, no pet.).  Once the
other parameters are established, the rule bars recovery even if the parties
are not in contractual privity.  Id. at 290.

The subject of the
Transportation Agreement is the delivery of natural gas to the Granbury power plant. 
Wolf Hollow alleges Enterprise negligently performed its duties under that
contract by delivering contaminated gas to the plant.  Wolf Hollow further
alleges that this contaminated natural gas damaged the turbines and other plant
equipment.  Because Wolf Hollow alleges that Enterprise’s negligence resulted
in physical damage to parts of Wolf Hollow’s power generating facility, which
were not the subject of the Transportation Agreement, the economic loss rule
does not preclude those specific claims.  Equistar Chemicals, 240 S.W.3d
at 867.  The cases Enterprise relies on in support of its economic loss rule
argument are all distinguishable, based on the fact they did not involve
physical damage to property separate from the property at issue in the contract;
therefore, they do not control the circumstances presented here.  See
Sterling Chems., Inc. v. Texaco Inc., 259 S.W.3d 793, 796 (Tex.
App.—Houston [1st Dist.] 2007, pet. denied) (affirming summary judgment on
claims for economic losses resulting from business interruptions; however,
trial court denied summary judgment motion on property damage claim and that
claim was not at issue on appeal); Hou-Tex, Inc. v. Landmark Graphics,
26 S.W.3d 103, 107 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (holding that
economic loss rule precludes recovery of economic damages only in the absence
of personal injury or property damage claims); Clems Ye Olde Homestead Farms
LTD v. Briscoe, No. 4:07CV285, 2008 WL 5146964, at *5 (E.D. Tex. December
8, 2008) (holding that economic loss rule precluded the plaintiffs’ tort claims
because they only alleged injuries to the subject of the contract itself).  Accordingly,
we sustain Wolf Hollow’s ninth issue as it relates to Wolf Hollow’s negligence
claim seeking relief for the physical damage allegedly caused to Wolf Hollow’s
power plant by the delivery of allegedly contaminated natural gas.

Conclusion

            The trial court properly granted El Paso’s
summary judgment based on the bar to consequential damages in the Supply
Agreement.  Consequently, we modify the final judgment to remove the
declaratory judgment language, and as so modified, affirm the portion of the
judgment respecting Wolf Hollow’s claims against El Paso.  Furthermore, having
sustained Wolf Hollow’s ninth issue on appeal, we reverse the judgment of the
trial court as it relates to Wolf Hollow’s negligence claim against Enterprise,
seeking relief for property damage allegedly caused to Wolf Hollow’s power plant,
and remand that claim to the trial court for further proceedings consistent
with this opinion.

 

                                                                                    

                                                                        /s/        Adele
Hedges

                                                                                    Chief
Justice

 

 

 

Panel consists of Chief
Justice Hedges and Justices Anderson and Christopher.

 









[1] Wolf Hollow’s
predecessor-in-interest is AES Wolf Hollow, L.P.  El Paso’s
predecessor-in-interest is El Paso Merchant Energy, L.P.





[2] The force majeure
provisions of the agreement are not reproduced herein because they are not
central to our resolution of this case.





[3] Wolf Hollow eventually
non-suited its negligence claim against El Paso, and it is not at issue in this
appeal.





[4] The parties agree that
the Supply Agreement is governed by New York law.  The parties also assert at
various times in their briefs that, at least on the issues raised in this
appeal, New York and Texas law are the same.  Finally, the parties made no
attempt to demonstrate any differences between the relevant law of New York and
Texas.  Therefore, we presume there is no difference between the law of New
York and Texas and apply Texas law.  Exxon Mobil Corp. v. Kinder Morgan
Operating L.P. “A”, 192 S.W.3d 120, 124 n.5 (Tex. App.—Houston [14th Dist.]
2006, no pet.). 





[5] In its eight issues
pertaining to the summary judgment favoring El Paso, Wolf Hollow contends that
the trial court erred in finding that (1) the four service interruptions
constituted, or arose from, events of force majeure; (2) El Paso’s fuel
management obligations in the Supply Agreement do not extend to issues of gas
quality; (3) Wolf Hollow’s exclusive remedy for fuel quality claims is an
assignment of El Paso’s claims against Enterprise; (4) Article XXI of the
Supply Agreement does not apply to issues of gas quality; (5) Wolf Hollow’s gas
quality claims have been released or waived pursuant to section 2.2 of the
First Amendment; (6) Wolf Hollow’s gas quality claims have been released or
waived pursuant to the indemnity provision in section 16.1 of the Supply
Agreement; (7) certain damages were “incidental, special, indirect, or
consequential”; and (8) Wolf Hollow sustained no direct damages.





[6] The Tennessee Gas
Pipeline case cited by Wolf Hollow and our own recent opinion in Cherokee
County Cogeneration Partners, L.P. v. Dynegy Marketing and Trade, 305
S.W.3d 309 (Tex. App.—Houston [14th Dist.] 2009, no pet.), are therefore
distinguishable because they applied common law and not UCC principles.





[7] As explained in the
immediately previous section of this opinion, Wolf Hollows citation to common
law definitions of direct and consequential damages are not applicable under
the facts of this case.





[8] Without explanation, Wolf
Hollow additionally suggests that if section 21.3(c) is not read as an
exception to the bar to consequential damages in section 24.11, then section
21.3 would be rendered meaningless.  This is incorrect.  As stated above,
section 21.3(c) is a particularly broad provision that could result in the
availability of numerous remedies and was not limited, as Wolf Hollow’s
argument suggests, to consequential damages.  Thus, simply reading the contract
such that section 21.3(c) does not implicate consequential damages (due to the
section 24.11 waiver of such damages) does not render the provision
meaningless.





[9]
The relevant portions of section 5.4 read as
follows:

 

Section 5.4  Fuel Manager Scope of Services.  (a)
[El Paso] shall implement a comprehensive plan jointly developed by [El Paso] and
[Wolf Hollow] for the procurement and administration of the Fuel Management
Services to be provided by [El Paso] in accordance with the terms of this
Article V.  The Fuel Management Services included in such comprehensive plan shall
be performed in a manner consistent with the requirements of Section 5.2 and the
other terms of this Article V.

(b) Without limiting Section 5.4(a), but subject to the
limitations set forth in this Article V, [El Paso] shall perform the following
Fuel Management Services:

 . . . . 

(v) use Prudent FM Practices to minimize any costs to [Wolf
Hollow], including but not limited to, hourly variance charges. daily imbalance
fees, and monthly cash-out charges assessed by the relevant Transporter under
its OBA or Transporter Tariff, storage fees and short-term parking and lending
fees . . . .





[10] In its reply brief, Wolf
Hollow states that what might be considered consequential damages under the UCC
for a gas sales contract might be considered direct damages for breach of a gas
management contract.  While this statement may be correct under certain
circumstances not present here, it is important to note that (1) the bar of
consequential damages in section 24.11 was not limited to issues involving only
the sale of natural gas but was applicable to the whole contract, including the
gas management provisions; and (2) as explained above, the primary focus of the
Supply Agreement was the sale of natural gas.  The claims made by Wolf Hollow
are in essence that El Paso failed to deliver goods on four occasions and
delivered contaminated goods in breach of warranty.  These are principally
sale-of-goods issues that are only tangentially related to the gas management
responsibilities (such as to monitor, manage, negotiate, consult, coordinate,
and use prudent practices) addressed in subsection 5.4(b)(v).  Accordingly, as
discussed above, these claims are best addressed under the UCC provisions for
the sale of goods.





[11] In the last section of
Wolf Hollow’s reply brief, it suggests in one sentence that there was no
resolution of its request in its petition for injunctive relief:  “The trial
court improperly entered a final judgment without considering or resolving Wolf
Hollow’s claim for permanent injunction.”  This point was neither properly
raised as an issue on appeal nor properly briefed.  See Tex. R. App. P.
38.1(i) (“The brief must contain a clear and concise argument for the
contentions made, with appropriate citations to authorities and to the
record.”); Pat Baker Co., Inc. v. Wilson, 971 S.W.2d 447, 450 (Tex.
1998) (“It is axiomatic that an appellate court cannot reverse a trial court’s
judgment absent properly assigned error.”); Methodist Hosp. v. Zurich Am.
Ins. Co., No. 14-07-00663-CV, 2009 WL 3003251, at *4 n.8 (Tex. App.—Houston
[14th Dist.] July 7, 2009, pet. denied) (declining to consider issue raised for
the first time in reply brief).





[12] El Paso sought
declaratory judgment specifically against the claims for past damages that Wolf
Hollow made the basis for its counterclaims in this lawsuit.  Because we have
ruled against Wolf Hollow on the merits of its claims, El Paso’s declaratory
judgment request regarding those same claims is rendered moot.





[13] While Enterprise filed
multiple motions for summary judgment, the trial court specifically granted
only the motion filed on July 31, 2008.  In this motion, Enterprise moved for
summary judgment only on the grounds mentioned above.  On appeal, Enterprise
asserts an additional basis to affirm the trial court’s summary judgment:  Wolf
Hollow’s negligence claim fails under the filed tariff doctrine.  Because this
ground for summary judgment was not presented to the trial court in the July
31, 2008 motion, we cannot consider it on appeal as a basis for affirming the
trial court’s judgment.  Travis v. City of Mesquite, 830 S.W.2d 94, 100
(Tex. 1992).